# United States Court of Appeals for the Federal Circuit

---

**DEPARTMENT OF TRANSPORTATION,**
*Appellant*

**v.**

**EAGLE PEAK ROCK & PAVING, INC.,**
*Appellee*

---

2021-1837

---

Appeal from the Civilian Board of Contract Appeals in No. 5692, Administrative Judge Beverly M. Russell, Administrative Judge Marian Elizabeth Sullivan, Administrative Judge Harold C. Kullberg.

---

Decided:  June 6, 2023

---

ASHLEY AKERS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellant.  Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY; RAYANN L. SPEAKMAN, Federal Highway Administration, United States Department of Transportation, Vancouver, WA.

DAVID WONDERLICK, Varela, Lee, Metz & Guarino, LLP, Tysons Corner, VA, argued for appellee.  Also represented by BENNETT J. LEE, STEPHEN LOUIS PESSAGNO, JR., San Francisco, CA.

———————————

Before NEWMAN, SCHALL, and TARANTO, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* TARANTO.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

TARANTO, *Circuit Judge.*

In May 2016, the Department of Transportation's Federal Highway Administration (FHWA) entered into a contract with Eagle Peak Rock & Paving, Inc., under which Eagle Peak would do specified construction work in Yellowstone National Park, with the work to be completed by October 5, 2018. The contract required Eagle Peak to submit to FHWA a schedule detailing how it would complete the project on time. But by late January 2017, FHWA (acting through either its contracting officer or project engineer) had rejected all eight formal schedule submissions by Eagle Peak as not complying with the contract's requirements, and in early February 2017, the contracting officer terminated the contract for default, concluding that Eagle Peak was insufficiently likely to complete the project on time.

Eagle Peak challenged the termination for default under the Contract Disputes Act of 1978 (CDA), Pub. L. No. 95-563, 92 Stat. 2383, codified as amended at 41 U.S.C. §§ 7101–7109, choosing to proceed before the Civilian Board of Contract Appeals under 41 U.S.C. §§ 7104(a) and 7105(b). The Board ruled that the termination for default was improper and converted the termination to one for the convenience of the government. It relied heavily, though not exclusively, on its view of deficiencies in the contracting officer's reasoning, rather than on de novo findings about what the record developed in the Board proceeding showed about whether the standard for a termination for default was met. *Eagle Peak Rock & Paving, Inc. v. Department of Transportation*, CBCA 5692, 21-1 BCA ¶ 37752, 2020 WL

7409948 (Dec. 7, 2020). We now vacate the Board's judgment and remand for the Board to adjudicate the case de novo on the record before it.

## I

## A

FHWA awarded a contract—valued at roughly $35 million—to Eagle Peak in May 2016, the work to consist of improving roads, parking areas, trails, and overlooks in Yellowstone National Park. *Eagle Peak*, CBCA 5692, at 1–2 (page numbers taken from version of opinion at J.A. 1–17); J.A. 768–69. Eagle Peak was to complete the project by October 5, 2018, with construction work to occur during three construction seasons. *Eagle Peak*, CBCA 5692, at 2; J.A. 771–72. The contract included one of the standard termination-for-default provisions of the Federal Acquisition Regulations (FAR), namely, FAR 52.249-10, 48 C.F.R. § 52.249-10. *Eagle Peak*, CBCA 5692, at 3; J.A. 770 (stipulation). Subsection (a) says that "[i]f the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time," then "the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed." *Eagle Peak*, CBCA 5692, at 3 (quoting FAR 52.249-10(a)).

On May 24, 2016, FHWA issued a notice to Eagle Peak that it could proceed with performance the next day. J.A. 772. Within 20 days of receiving the notice to proceed, Eagle Peak was to provide an initial construction schedule that would set a "baseline" for the project and would incorporate various restrictions imposed by the contract, *e.g.*, halting construction during the winter and not engaging in certain activities during bird-migration season. J.A. 71–83; J.A. 744; J.A. 757; J.A. 771–72. But Eagle Peak did not submit a schedule by the deadline. J.A. 86.

On June 25, 2016, FHWA notified Eagle Peak that the required schedule was past due and warned that the contracting officer might withhold progress payments. *Id.* Eagle Peak followed up by submitting several "draft" schedules throughout June and July, but FHWA's project engineer rejected each as noncompliant and explained the bases for the rejections. J.A. 97–101; J.A. 104–07; J.A. 410–12. In early August, FHWA began withholding progress payments. J.A. 108. Eagle Peak then submitted three "formal" schedules in August, but the project engineer again rejected each as noncompliant and identified and explained the errors, *e.g.*, working during the winter shutdown and ignoring the restrictions associated with bird migration. *Eagle Peak*, CBCA 5692, at 4; *see also* J.A. 109–15; J.A. 210–12; J.A. 246–50; J.A. 406–07; J.A. 412–13.

On October 3, 2016, the contracting officer issued a "cure" notice to Eagle Peak. *Eagle Peak*, CBCA 5692, at 4; J.A. 464. In it, she noted that she was contemplating terminating the contract for default due to Eagle Peak's failure to submit a contract-compliant schedule, and—echoing the language of the contract-incorporated FAR 52.249-10(a)—she explained that the four-month delay raised "great concern that Eagle Peak is not prosecuting the work with sufficient diligence to ensure completion with[]in the time specified in the contract." J.A. 464; *see Eagle Peak*, CBCA 5692, at 4. Eagle Peak directed its scheduling subcontractor "to get this schedule cured asap," J.A. 465–67, and responded to the officer's letter on October 6, stating that it was working with its expert to submit a compliant schedule and that timely completion was not endangered, J.A. 469–70.

Between October 13, 2016, and January 25, 2017, Eagle Peak submitted five more schedules, each of which the contracting officer rejected. *Eagle Peak*, CBCA 5692, at 4–9; J.A. 772. The officer ultimately terminated the contract for default on February 1, 2017, citing her lack of

confidence in Eagle Peak's ability to create a schedule or to complete the project by the deadline. *Eagle Peak*, CBCA 5692, at 9; J.A. 714–15; J.A. 773.

B

Eagle Peak appealed the termination for default to the Board under 41 U.S.C. §§ 7104(a) and 7105(b). *Eagle Peak*, CBCA 5692, at 1–2. The Board first made several findings of fact—including findings about the contract between FHWA and Eagle Peak, Eagle Peak's various schedule submissions after receiving the October 2016 cure notice, and the contracting officer's termination for default. *Id.* at 2–11. On the last of those matters, the Board found an error in the officer's calculation of the percentage of work completed by Eagle Peak at the time of the termination, and it noted her inability to recall whether she had reviewed certain documents, such as Eagle Peak's narrative reports accompanying its schedules. *Id.* at 10–11.

In its analysis after setting forth those findings, the Board first explained that, even though Eagle Peak initiated the appeal, "[a] termination for default is a government claim, and the Government bears the burden of proof that its action was justified," *id.* at 11 (internal quotation marks omitted), citing authorities back to *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764–65 (Fed. Cir. 1987) (same). The Board then stated what it believed the government had to justify—based on the FAR 52.249-10(a) language concerning a contractor's failure to prosecute the contract work "with the diligence that will insure its completion" by the due date. *Eagle Peak*, CBCA 5692, at 3. The Board said that the government must justify the determination that "there was no reasonable likelihood of Eagle Peak's timely performance by October 5, 2018," *id.* at 11, and (seemingly meaning the same thing) that the government "must show that it was reasonable for the contracting officer to determine there was 'no reasonable likelihood' of timely completion," *id.* at 12 (citation omitted). *See Lisbon*,

828 F.2d at 765 (in case involving materially identical termination-for-default contract provision, stating: "we construe the contract . . . to require a reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance" (bracketed alteration in original) (internal quotation marks omitted)).

The Board proceeded to apply that standard in a discussion that focused heavily, though not entirely, on what the contracting officer said and considered in determining that timely completion was in sufficient doubt, rather than on what the record developed before the Board showed about whether timely completion was in sufficient doubt. Notably, the Board found neither that the contracting officer failed to make a determination about Eagle Peak's performance (to date and to be expected) nor that the officer's statements about performance were a pretext for a decision actually made on non-performance grounds. *See Darwin Construction Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987) (holding that the Board was required to set aside a termination for default, on facts similar to precedent in which "the contractor's status of technical default served only 'as a useful pretext for taking the action found necessary on other grounds unrelated to the plaintiff's performance or to the propriety of the extension of time,'" *i.e.*, where the government "'used the termination article as a "device" and never made a "judgment as to the merits of the case"'" (quoting *Schlesinger v. United States*, 390 F.2d 702, 709 (Ct. Cl. 1968))). The Board thus accepted that the contracting officer's decision was performance-based and not pretextual, though it did not make express findings to that effect. Despite that acceptance, the Board devoted much of its discussion to finding faults in the contracting officer's reasoning.

The Board stated that the contracting officer "failed to consider" (or did "not give[] due consideration" to) a number

of factors, such as "the urgency" of the government's need for the contractor's services or the contractor's "resource capability," set out in a FAR regulation, 48 C.F.R. § 49.402-3, concerning terminations for default. *Eagle Peak*, CBCA 5692, at 12–14. The Board also criticized "the contracting officer's exclusion of [Eagle Peak's] mobilization efforts from her assessment of work completed in the first season." *Id.* at 14. The Board further stated that "the contracting officer's decision based so substantially upon Eagle Peak's [Critical Path Method] schedules is not sufficient to support the termination." *Id.* at 15. The Board stressed that "[t]he Government is given discretion to terminate a contract for default, and that discretion must be exercised in a reasonable and fair manner." *Id.* at 16. Interspersed with the foregoing statements about deficiencies in the contracting officer's reasoning are Board findings, on some of the just-mentioned points and others, that address what the evidence presented in the Board proceeding showed. *Id.* at 14–17. But although the "reasonable and fair" language can (and must, as we will explain) be applied to assess the termination de novo on the record evidence, the Board, in applying that language, seems to have focused heavily on the contracting officer's reasoning, in contrast to making its own findings based on the evidence. Indeed, at the end of its opinion, the Board said that it "need not resolve the issue of whether Eagle Peak . . . was making sufficient progress on the contract such that timely contract completion was not endangered." *Id.* at 17.

The Board issued its decision on December 7, 2020, and the government filed a notice of appeal on April 6, 2021, within the 120 days permitted by 41 U.S.C. § 7107(a)(1)(B). We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## II

Under the Contract Disputes Act, "we review legal conclusions of the [Board] without deference" and "accept the [Board's] findings of fact unless they are: (1) fraudulent; (2)

arbitrary or capricious; (3) so grossly erroneous as to necessarily imply bad faith; or (4) not supported by substantial evidence." *Ryste & Ricas, Inc. v. Harvey*, 477 F.3d 1337, 1340 (Fed. Cir. 2007) (citations omitted); *see* 41 U.S.C. § 7107(b).   Those standards govern our review of the Board's decision.  What the government challenges is the Board's approach to judging the dispute about the underlying termination for default.  We agree that the Board committed legal errors in extensively focusing on the contracting officer's reasoning instead of simply judging de novo, on the evidence developed in the Board proceeding, the claim before it (termination for default).  For that reason, and others we set out, we vacate the Board's decision and remand the case.

A

Whenever a contracting officer makes a decision subject to the Contract Disputes Act, "[s]pecific findings of fact are not required," and "[i]f made, specific findings of fact are not binding in any subsequent proceeding."  41 U.S.C. § 7103(e).  The statute expressly provides that if a contractor challenges that decision in the Court of Federal Claims (Claims Court), the action "shall proceed de novo" under the court's rules.  *Id.* § 7104(b)(4).  And we have explained that the same is true when the challenge is brought to the Board: The case must proceed de novo, based on the evidentiary record before the Board and not the officer's reasoning or findings of fact.  *See Wilner v. United States*, 24 F.3d 1397, 1401–02 (Fed. Cir. 1994) (en banc) ("The plain language of the CDA and our decision in *Assurance* also make it clear that, in court litigation, a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision.  De novo review precludes reliance upon the presumed correctness of the decision.  Thus, once an action is brought following a contracting officer's decision, the parties start in court or before the [B]oard with a clean slate." (citation omitted)); *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987).

That is so, in particular, with respect to a termination for default. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003) (*McDonnell Douglas XII*) ("[I]t is well-settled that the [tribunal] . . . reviews the decision to terminate a contractor for default *de novo*.").

When a contracting officer terminates a contract for default, and the contractor appeals that termination decision, "the government . . . bear[s] the burden of proof with respect to the issue of whether termination for default was justified." *Lisbon*, 828 F.2d at 765. In failure-to-make-progress cases, the government must establish that "the contracting officer's decision to terminate . . . was reasonable given the events that occurred before the termination decision was made." *Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1357–58 (Fed. Cir. 2004); *see id.* at 1358 (affirming the Board's finding that the contracting officer "had a reasonable basis for default termination" (citation omitted)); *Danzig v. AEC Corp.*, 224 F.3d 1333, 1336 (Fed. Cir. 2000) (noting that "the government [must] show that it was reasonable for the [governmental decisionmaker] to conclude that [the contractor] would be unable to complete the project by what the Board found to be the proper completion date"). If the government makes this showing, the contractor then bears the "burden of proving that its nonperformance was excusable." *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996); *see also McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 (Fed. Cir. 2009) (noting that burden shifts to contractor to rebut government's untimeliness showing or to establish "that there was excusable delay"), *vacated and remanded on other grounds by General Dynamics Corp. v. United States*, 563 U.S. 478 (2011).

Importantly, the "reasonable basis" language of the substantive standard does not put the focus on the contracting officer's own reasoning. The CDA's de novo standard—rooted partly in the statute's command that "[s]pecific findings of fact are not required" to be made by the

10      TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

contracting officer, and "[i]f made, specific findings of fact are not binding in any subsequent proceeding," 41 U.S.C. § 7103(e)—requires a determination by the Board on the evidentiary record developed in the proceeding. One aspect of that requirement is that the statute "demands an objective inquiry, not an evaluation of the contracting officer's subjective beliefs," when ascertaining whether the government has met its burden. *Empire Energy*, 362 F.3d at 1357. More broadly, "once an action is brought following a contracting officer's decision, the parties start in court or before the [B]oard with a clean slate," *Wilner*, 24 F.3d at 1402, although the government may well present testimony by the contracting officer, among other evidence, about the facts bearing on the issue before the tribunal, *id.* at 1403.

On the often-central issue of whether it was reasonable to view timely completion as not reasonably likely, *see Empire Energy*, 362 F.3d at 1357–58; *Lisbon*, 828 F.2d at 765, the tribunal must focus on "tangible, direct evidence reflecting the impairment of timely completion," *McDonnell Douglas XII*, 323 F.3d at 1016. In particular, the Board must "decide the actual performance that the contract requires and the amount of time remaining for performance" and "may also consider" factors such as "the contracting officer's testimony and contemporaneous documents[,] . . . a comparison of the percentage of work completed and the amount of time remaining under the contract, the contractor's failure to meet progress milestones, problems with subcontractors and suppliers, the contractor's financial situation, . . . a contractor's performance history, and other pertinent circumstances." *Id.* at 1016–17 (citations omitted). This is a de novo adjudication: If the adjudicatory tribunal finds, based on all the evidence before it, that the standard for termination under the contract's default clause is met, it is to uphold that decision whether or not the contracting officer stated the basis for that finding. As we explained in *Empire Energy, c*larifying some language in *McDonnell Douglas XII*, 323 F.3d at 1017:

> Our decisions have consistently approved default terminations where the contracting officer's ground for termination was not sustainable if there was another existing ground for a default termination, regardless of whether that ground was known to the contracting officer at the time of the termination. Thus, the subjective knowledge of the contracting officer herself is irrelevant, and the government is not required to establish that the contracting officer conducted the analysis necessary to sustain a default under the alternative theory.

362 F.3d at 1357 (citations omitted); *see also Kelso v. Kirk Brothers Mechanical Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed. Cir. 1994) ("This court sustains a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason." (citation omitted)).

In addition to the issues of failure to meet contractual obligations and endangerment of timely completion (in the sense explained in *Lisbon*), the standard termination-for-default clause at issue here presents what can be considered a threshold issue—whether the contracting officer actually terminated the contract for default on the basis of a perceived performance problem. Specifically, the termination-for-default decision must be performance-based and not pretextual, under the *Schlesinger* and *Darwin Construction* decisions quoted above. *See supra* p. 6; *see also McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329 (Fed. Cir. 1999) (*McDonnell Douglas X*) ("[T]he government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance."). That limited nexus requirement is implicit in the standard termination-for-default contract clause.

We have sometimes used broader language about whether the contracting officer's decision was "arbitrary and capricious" or an "abuse of discretion." *See, e.g.*, *DCX*, 79 F.3d at 135; *Darwin*, 811 F.2d at 597–98. But Eagle Peak agreed at oral argument that this court (unlike the Board or the Claims Court) has not overturned a contracting officer's decision based on this threshold nexus requirement in the absence of a showing that the contracting officer's decision was pretextual and unrelated to contract performance. *See* Oral Arg. at 29:07–30:22. And there is a simple reason the nexus requirement is not properly understood to suggest the broader inquiry ordinarily implicit in the "arbitrary and capricious" and "abuse of discretion" language we have sometimes used. Such a standard does not comport with the above-stated law calling for a de novo adjudication on a newly developed record that may include newly asserted bases for the contracting officer's decision. Contrary to that law, "arbitrary and capricious" review ordinarily calls for examination of whether a decision was not just "reasonable" but also "reasonably explained" by the agency, *Federal Communications Commission v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), thus focusing on the agency's own reasoning, with the added constraint that fact finding by the tribunal is not a proper substitute for what the reviewed agency itself determined, *see Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). Likewise, the "abuse of discretion" standard is generally contrasted with a "de novo" standard, the latter being the one that governs under the CDA. *See McLane Co. v. Equal Employment Opportunity Commission*, 581 U.S. 72, 79–85 (2017); *Highmark Inc. v. Allcare Health Management System, Inc.*, 572 U.S. 559, 563–64 (2014); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399–405 (1990).

Accordingly, as long as "the termination for default was predicated on contract-related issues," *i.e.*, "the government's default termination was not pretextual or unrelated

to Contractors' alleged inability to fulfill their obligations under the contract," *McDonnell Douglas X*, 182 F.3d at 1321, 1326, the reasoning of the contracting officer at the time of termination is not the subject of the CDA adjudication, which must proceed on the evidence and arguments made in the adjudicatory proceeding, not through arbitrary-and-capricious or abuse-of-discretion review. Of course, the substantive contract standard, in its endangerment-of-timely-completion component, doubly considers what is "reasonable"—whether it was "reasonable" to find that there was no "reasonable likelihood" of timely completion. *Empire Energy*, 362 F.3d at 1357–58; *Lisbon*, 828 F.2d at 765. But the CDA tribunal must apply that substantive contract requirement de novo, not through one of the deferential standards of review.

B

The Board, in its opinion on review here, did not clearly separate its de novo analysis of the record evidence, *see, e.g.*, *Eagle Peak*, CBCA 5692, at 2 (discussing required performance and project completion date); *id.* at 10–16 (evaluating Eagle Peak's expert's testimony, Eagle Peak's narrative reports accompanying its schedule submissions, and the percentage of work completed relative to the percentage of time used up), from its more extensive threshold analysis of the officer's reasoning, *see, e.g.*, *id.* at 12 ("abuse of discretion" (citation omitted)); *id.* at 12–13 (discussing "failure to consider . . . critical information"); *id.* at 14 (noting that "substantial information . . . was not given due consideration"); *id.* (noting "inaccurate assessment of work completed by Eagle Peak prior to termination" (capitalization removed)); *id.* at 16 ("[D]iscretion must be exercised in a reasonable and fair manner . . . ."); *id.* at 17 ("The Boards of Contract Appeals have authority to set aside terminations for default where they find that the contracting officer has not acted fairly and reasonably, i.e., where the contracting officer's action was arbitrary and cap[r]icious." (cleaned up) (citation omitted)). Given the Board's mixing

14      TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

of the two analyses, we do not have an adequate basis for deeming parts of the opinion that seem to make de novo findings sufficient to uphold the Board's decision. Indeed, the Board expressly declined to determine whether timely performance was endangered by Eagle Peak's inability to submit a compliant schedule. *See id.* at 17 ("[B]ecause we find that the termination was improper, we need not resolve the issue of whether Eagle Peak . . . was making sufficient progress on the contract such that timely contract completion was not endangered.").

The Board's threshold analysis, moreover, was erroneous in going beyond the issues of pretext and a performance basis. *See*, *e.g.*, *id.* at 12–14 (discussing "failure to consider one or more of the factors" found in FAR 49.402-3 (citation omitted)).[1] And even on the limited pretext/performance-basis issue, the Board did not make a finding in Eagle Peak's favor or, in fact, any express finding at all. Without suggesting that the evidence would support a finding in Eagle Peak's favor, we note that this is an issue for remand, along with whether the facts support a reasonable view

---

[1]    The Board's analysis also was contrary to our holding that the "failure to consider one or more of the . . . factors" found in FAR 49.402-3 "does not require that a default termination be converted into a termination for the convenience of the government," as "the regulation does not confer rights on a defaulting contractor," so consideration of those factors is not a "prerequisite[] to a valid termination." *DCX*, 79 F.3d at 135. At most, the factors "may aid a Board of Contract Appeals or a court in determining whether a contracting officer has abused his discretion in terminating a contract for default." *Id.* As explained above, that threshold inquiry is properly limited to whether the termination decision was pretextual and unrelated to performance.

that timely completion was not "insure[d]," FAR 52.249-10(a), as *Lisbon* interpreted that requirement.

In sum, the Board's evaluation of the contracting officer's reasoning exceeded the limited scope of the threshold inquiry recognized by this court. The Board also failed to separate that threshold analysis from its de novo evaluation of the record evidence bearing on whether termination for default was justified. Because of these errors, we vacate and remand for re-adjudication on the existing record.

### III

For the foregoing reasons, we vacate the Board's decision and remand the case for proceedings consistent with this opinion.

The parties shall bear their own costs.

**VACATED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

---

**DEPARTMENT OF TRANSPORTATION,**
*Appellant*

**v.**

**EAGLE PEAK ROCK & PAVING, INC.,**
*Appellee*

---

2021-1837

---

Appeal from the Civilian Board of Contract Appeals in No. 5692, Administrative Judge Beverly M. Russell, Administrative Judge Marian Elizabeth Sullivan, Administrative Judge Harold C. Kullberg.

---

NEWMAN, *Circuit Judge,* dissenting.

The Civilian Board of Contract Appeals (CBCA or "Board") determined that the United States Department of Transportation, Federal Highway Administration (FHWA or "agency") improperly terminated a contract with Eagle Peak Rock & Paving, Inc. on the ground of default. The asserted default was based on the contracting officer's finding that Eagle Peak made inadequate progress during the first year of this three-year contract. The Board converted

2            TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

the termination for default into a termination for convenience of the government under 48 C.F.R. § 52.212-4(*l*).[1]

The Board's decision was reached after an evidentiary hearing with witnesses for both sides and briefing, argument, and explanation.  The Board's decision is supported by substantial evidence and is in accordance with law.  Nonetheless, the panel majority declines to complete our appellate review, and returns the case to the Board for redetermination of the same issue on the same record – to the delay, burden, and cost of both sides.  I respectfully dissent.

DISCUSSION

The issue on appeal is whether the Board appropriately held that this contract should be subject to termination for convenience, or whether the contracting officer's termination for default should be reinstated.

The contract relates to various structural and highway construction projects in Yellowstone National Park and was to be performed over three years.  After one year the FHWA contracting officer terminated the contract for default, holding that Eagle Peak had not made sufficient progress.  On Eagle Peak's appeal to the Board, the Board converted the termination into a termination for convenience, citing the many errors in the FHWA's project specifications, the ensuing delays, the steps taken in correction, and the failure of the contracting officer to consider these aspects.

At the Board's hearing, witnesses for both sides agreed that the Contract Documents contained errors of major impact on performance of the contract.  FHWA Project Engineer, Kyle Stone, stated that he had "never seen this many

---

[1]    *Eagle Peak Rock & Paving, Inc. v. Dep't of Transp.*, CBCA 5692, 21-1 BCA ¶ 37752, 2020 WL 7409948 (Dec. 7, 2020) ("Board Op.").

issues with the physical data on a Yellowstone contract." Appx1022 (email from FHWA Project Engineer Kyle Stone to FHWA Construction Operations Engineer Howe Crockett).

The contracting officer testified that she terminated the contract for default without consideration of Eagle Peak's proposed schedule to correct FHWA's errors or of Eagle Peak's proposed activities to meet the original completion date. *See* Eagle Peak Br. 5 ("Eagle Peak's January 25, 2017 Recovery Schedule reflected Eagle Peak's plan to accelerate the remaining two seasons of work to overcome excusable delays for which the FHWA was responsible and complete the Project work (including the Mainline [mechanically stabilized earth] wall) by October 5, 2018.").

Throughout the Board hearing, the contracting officer testified that she did not consider the effect of the FHWA's specification errors on performance of the contract, did not respond to Eagle Peak's request for corrected Contract Documents, and did not consider Eagle Peak's proposed schedules for meeting the three-year completion date. With full explanation of its reasoning, the Board determined the contract issue. That determination is now before us on the government's request for appellate review. On an unchallenged record and undisputed facts, it behooves this court to conduct that review, not to require the Board to do it again.

I

The contract is for a construction project for portions of the Grand Loop Road within Yellowstone National Park, including parking areas, trails, and overlooks, for four primary sites. Details are presented in Contract Documents provided by the FHWA, and performance is scheduled over three seasons.

During the first season it became apparent that the Contract Documents contained major errors, which were

4        TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

the subject of testimony by both sides at the CBCA hearing. In brief summary:

### 1. **The Mainline mechanically stabilized earth wall**

This portion of the Mainline wall extends approximately 1,400 feet along Grand Loop Road. The Eagle Peak work on this segment was scheduled for completion in the first construction season. However, an error in the Contract Documents affected the schedule.

The Contract Documents state that the ground where the Mainline earth wall would be built did not contain soft soils or underground water. Appx0973–76 (the Boring Log from the Contract Documents); Appx1545–48 (Testimony of Tony Cruse, Eagle Peak president and engineer). However, when Eagle Peak began digging at the site, it found an unstable subgrade of soft soils, and underground water with a high water table up to subgrade level.

FHWA witnesses testified that these conditions required additional work and made construction more complex and more time-consuming than the Contract Documents contemplated. *See* Appx1022–23 (FHWA Project Engineer Kyle Stone describing problems with the project design, acknowledging they have created a lot of extra work, and requesting verifications of several elements of the design).

### 2. **Inspiration Point elevation error**

Eagle Peak started work at Inspiration Point during the first year and discovered that the existing ground was 2–3 feet lower than the elevations in the FHWA Contract Documents. This admitted error "prevented Eagle Peak from implementing its planned work sequence and impacted the work at virtually every portion of Inspiration Point." Eagle Peak Br. 6.

Eagle Peak proceeded with work on this site and requested corrected designs. Full corrected designs were never provided, although the record shows that the FHWA acknowledged that the delay could "impact [the] critical path" of the work. Eagle Peak Br. 6–7 (quoting an email from FHWA Project Engineer Kyle Stone to Contracting Officer Elizabeth Firestone). These facts were undisputed at the Board hearing.

### 3. **Brink of the Upper Falls instability**

The record recites "[a]t least three sources of FHWA-caused delays" at the Upper Falls site at the east edge of the Yellowstone River. Eagle Peak Br. 7. The Contract Documents provided for work at the Brink of the Upper Falls Historic Wall, but instability of the site prevented use of the heavy equipment, including the placement of a 90-ton crane on the wall.

"The FHWA acknowledged both the need for a redesign to address the wall's instability, and that the '[p]ending [c]ontract [m]odification' for this changed work '[m]ay impact [the] critical path.'" Eagle Peak Br. 7 (citations to record omitted). Eagle Peak states, and the FHWA agrees, that "the FHWA never issued a redesign before termination." Eagle Peak Br. 7; *see* Appx1590–92 (contracting officer's testimony agreeing that "the ball was in the [FHWA's] court" and stating the unanswered questions "left things up in the air").

In addition, the FHWA delayed commencement of work on the Upper Falls Historic Wall for at least 26 days, such that this work could not be included in the first construction season. None of this evidence was disputed.

### 4. **Uncle Tom's Point micropiles**

The Uncle Tom's Point site is at the west edge of the Yellowstone River. The FHWA design specified insufficient linear feet of micropile materials to allow them to

reach and be driven into the bedrock.  Eagle Peak recites that "[a]lthough the FHWA's Project Engineer, Mr. Kyle Stone, notified CO Firestone that he was 'very aware of' the design error and 'would like to issue a [Contract Modification],' the FHWA never issued a revised design or Contract Modification before terminating Eagle Peak's Contract." Eagle Peak Br. 8.

### 5.  Additional design errors and omissions

The record refers to additional errors and omissions that were not corrected by the FHWA before the contracting officer terminated the contract for default.  FHWA's Senior Engineer, Jason Hahn, testified "that there is [sic] likely numerous errors in elevations in many of the overlook designs." Appx1310.  The FHWA stated at the Board hearing that there were at least nine pending contract modifications, none of which had issued.  Appx1206–07, Appx1211, Appx1226 (various emails from FHWA Project Engineer Kyle Stone to Contracting Officer Elizabeth Firestone).

## II

On a contractor's appeal from termination for default, "the government . . . bear[s] the burden of proof with respect to the issue of whether termination for default was justified." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).  When the asserted termination ground is the contractor's failure to make adequate or scheduled progress, the government bears the burden of establishing that "the contracting officer's decision to terminate . . . was reasonable given the events that occurred before the termination decision was made." *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357–58 (Fed. Cir. 2004).  And even if this standard is met, the contractor may prevail if it meets the "burden of proving that its nonperformance was excusable." *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996) (stating the burden shifts to the

contractor to show that any delay was excusable).  Within this framework, the Board sustains a contract termination for default only when there was "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Lisbon Contractors*, 828 F.2d at 765 (quoting *In re RFI Shield-Rooms*, ASBCA Nos. 17374, 17991, 77-2 BCA (CCH) ¶ 12,714, 61,735 (Aug. 11, 1997)).

A

**Contract Disputes Act Appeals**

As stated in *Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994) (en banc), when an action is brought under the Contract Disputes Act following a contracting officer's decision, the parties start in the Board with a clean slate.  *Id.* at 1402; *see Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987).

Instead of correcting the design errors and processing appropriate contract modifications, the contracting officer terminated the contract for default, asserting lack of progress during the first year.  However, the Board recognized the error in this theory, for it was undisputed that the design errors and absence of correction of those errors affected progress during the first year.  And it was not disputed that the FHWA was the sole source of those errors.  The reduction in scheduled progress during the first contract year was not the fault of Eagle Peak, but of the agency.

The panel majority states that on review of "whether a contracting officer has abused his discretion in terminating a contract for default," the "threshold inquiry is properly limited to whether the [contracting officer's] termination decision was pretextual and unrelated to performance." Maj. Op. at 14 n.1 (quotation marks and citation omitted). On the general standard of administrative review, the

8        TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

Board's decision is reviewed to determine whether substantial evidence supports the Board's findings of fact, and whether the Board's conclusion is in accordance with law.

Although the panel majority spots the flaws in the government's arguments in support of termination for default, the panel majority declines to resolve the merits, instead asking the Board to repeat its prior evaluation. There are no disputed facts, and the case warrants finality.

### 1. **The FAR factors**

The Board held that the FHWA had not met its burden of showing that termination for default was reasonable. The Board considered the regulatory factors of FAR 49.402-3(f), especially subparts (f)(4) and (f)(7), and found:

> With two full seasons remaining on the contract, the contracting officer here failed to consider "the urgency of the need for the . . . services [described in the contract] and the period of time" that another contractor would have required to complete the remaining work on the contract compared with the date by which Eagle Peak could have completed performance under the contract.

Board Op. at 8 (quoting FAR 49.402-3(f)(4)) (ellipsis, brackets, and underline in original). The Board found "that FHWA's failure to consider this critical information, particularly with so much time remaining on the contract, [is] a factor weighing against a determination that the agency's termination was reasonable." *Id.*

The Board cited FAR 49.402-3(f)(7) and precedent of the Board and this court, and held that "[a] careful examination here should have included consideration of both parts of Eagle Peak's schedule submissions – the CPM [critical path method] schedule and the narrative describing the company's resource capabilities." *Id.*

The Board stated: "Significantly here, Eagle Peak's evidence showing that the company had adequate resources to timely complete the project remained undisputed." *Id.* Whatever evidence the panel majority suggests the Board should consider on remand was already before the Board and was integrated into the Board's decision.

### 2.  **The work completed assessment**

The contracting officer estimated 9–10% of the work was completed in 2016. *Id.* The FHWA's expert Steven Weathers assessed 17.1% work completed. *Id.* at 9. Eagle Peak's expert Jason Nolting estimated 26.5% work completed when weather and design impacts were considered. *Id.*

The Board concluded that Eagle Peak's progress was not "so deficient as to support a termination for default based on a calculation of work completed." *Id.* The Board discussed Eagle Peak's critical path schedules and narratives, and found that Eagle Peak "was ready, willing, and capable of performing the project work in the two remaining seasons of the contract." *Id.* at 10. The Board concluded:

> Unlike the cases cited by FHWA which demonstrated that default was clearly warranted, we cannot find the facts in this appeal reflect "impairment of timely completion" of the Yellowstone project, particularly with two full construction seasons remaining under the contract, justifying the drastic sanction of default termination.

*Id.*

Eagle Peak argues that even if it were reasonable for the contracting officer to believe there was no expectation of timely completion, any delay in Eagle Peak's first year of progress was excusable because of the myriad flaws and errors in the FHWA's Contract Documents, and failure of

10    TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

the FWHA to correct these flaws and errors. It is relevant that Eagle Peak's submission of the 2017 Recovery Schedule "reflected significant acceleration efforts to overcome FHWA-caused excusable delays and timely complete the remaining work, including work resequencing and the provision of substantial additional resources, such as three additional superintendents, two Canyon Rim crews, two Mainline crews, and both night and day crews." Eagle Peak Br. 14. Eagle Peak's Narrative Report with this information, accompanied by witness testimony and full briefing, was before the Board.

B

**Review of the Board's findings**

The panel majority observes that the Board's factual findings must be accepted "unless they are: (1) fraudulent; (2) arbitrary or capricious; (3) so grossly erroneous as to necessarily imply bad faith; or (4) not supported by substantial evidence." Maj. Op. at 7–8 (quoting *Ryste & Ricas, Inc. v. Harvey*, 477 F.3d 1337, 1340 (Fed. Cir. 2007) (citations omitted)); *see also Rockies Express Pipeline, LLC v. Salazar*, 730 F.3d 1330, 1335 (Fed. Cir. 2013) (stating factual findings of the Board are only overturned "if they are arbitrary, capricious, or unsupported by substantial evidence"); *Tip Top Constr., Inc. v. Donahoe*, 695 F.3d 1276, 1281 (Fed. Cir. 2012) (factual findings of the Postal Service Board of Contract Appeals are final unless they are "fraudulent, arbitrary, or capricious," "so grossly erroneous as to imply bad faith," or "not supported by substantial evidence").

The Board made explicit findings of fact pertinent to the conclusion that it was unreasonable for the contracting officer to have found no reasonable likelihood of timely project completion. The Board found that "Eagle Peak's assurances [to the contracting officer of sufficient resources] were supported by detailed information," Board Op. at 8,

and that this adequacy of resources for timely completion was "undisputed," *id.* The record before us has exposed no reversible error. These findings, along with those regarding the assessment of work completed, discussed *supra*, support the Board's conclusion that it was unreasonable to find no reasonable likelihood of timely completion, and the Board's opinion explains where it found substantial evidence in the record.

The panel majority states that "the Board expressly declined to determine whether timely performance was endangered by Eagle Peak's inability to submit a compliant schedule." Maj. Op. at 14. However, the Board explicitly found that Eagle Peak "was ready, willing, and capable of performing the project work in the two remaining seasons of the contract." Board Op. at 10; *see also Discount Co. v. United States*, 213 Ct. Cl. 567, 576 (1977) (finding that termination for failure to file a work schedule was wrongfully focused on a "technicality," unless the underlying "function of the work schedule," *i.e.*, "to show that the contractor was ready, willing and able to make progress," was sufficiently in doubt as to make the government "justifiably insecure about the contract's timely completion").

The panel majority's ruling that the Board erred "in going beyond the issues of pretext and a performance basis," Maj. Op. at 14, is contrary to the principles of review under the Contract Disputes Act. And the majority's emphasis on "the limited scope of the threshold inquiry recognized by this court," Maj. Op. at 15, takes the words of precedent beyond the context in which they arose.

The panel majority, while acknowledging this court's obligation to conduct *de novo* review of legal conclusions on appeal, Maj. Op. at 7, nonetheless declines to perform *de novo* review.

12        TRANSPORTATION v. EAGLE PEAK ROCK & PAVING, INC.

C

*De Novo* **Review**

Precedent for government contracts reinforces that "[t]ermination is the most drastic of remedies." *In re Pipe Tech, Inc.*, ENGBCA No. 5959, 94-2 B.C.A. (CCH) ¶ 26,649 (Dec. 20, 1993). The government bears the burden of proving the propriety of the termination by a preponderance of the evidence. *Lisbon Contractors*, 828 F.2d at 765. Here, termination was imposed after one year of a three-year contract, despite significant performance during that year, in the face of significant obstacles arising from government errors.

Also, the government cannot "satisfy its burden by merely showing that the contractor was behind schedule." *Id.* The contracting officer's termination decision must "be based on tangible, direct evidence reflecting the impairment of timely completion." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2003). The Board correctly held, applying precedent, that the agency must show "that there was no reasonable likelihood of Eagle Peak's timely performance by October 5, 2018." Board Op. at 7.

The government argues that "[b]ecause Eagle Peak made no allegation before the board that the default termination was anything other than performance-related, the board should never have reviewed the termination for abuse of discretion." Gov't Reply Br. 6. The government is correct that the proper application of law cannot be waived. *Id.* at 7 (citing *Aposhian v. Wilkinson*, 989 F.3d 890, 897 n.4 (10th Cir. 2021) (en banc) (Tymkovich, C.J., dissenting) ("[P]arties typically cannot waive the proper standard of review.")); *see also Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."). "When an issue or claim is properly before the

court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

## CONCLUSION

There is no need to repeat this administrative proceeding, for the record is complete, both sides have been fully and fairly heard, and the Board has explained the reasons for its determination. The matter is now before us for appellate review, including *de novo* review of certain issues. Refusing to adjudge the matter now delays justice, which is contrary to the principles "generally applicable to good judicial administration." *Radio Station WOW v. Johnson*, 326 U.S. 120, 124 (1945); *see also Cobbledick v. United States*, 309 U.S. 323, 325 (1940) ("To be effective, judicial administration must not be leaden-footed."). From the majority's decision to vacate the Board's decision and remand for repetition of the Board's analysis, I respectfully dissent.