ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Pinewood Inc. fka PNI Incorporation | ) ASBCA Nos. 63588, 63686 |
| | ) |
| Under Contract No. W912UM-22-C-0003 | ) |

APPEARANCE FOR THE APPELLANT:      Yong Eui Song, Esq.
                                                                 Central IP & Law
                                                                 Seoul, Korea

APPEARANCES FOR THE GOVERNMENT:      Michael P. Goodman, Esq.
                                                                          Engineer Chief Trial Attorney
                                                                       Robert M. Sundberg, Esq
                                                                       SoCheung Lee, Esq.
                                                                          Engineer Trial Attorneys
                                                                          U.S. Army Engineer District, Far East
                                                                          Seoul, Korea

OPINION BY ADMINISTRATIVE JUDGE STINSON

Appellant Pinewood Inc., formerly known as PNI INC,[1] appeals (1) a contracting officer (CO) final decision dated February 17, 2023, terminating PNI's contract for default and (2) a CO final decision dated March 6, 2024, denying PNI's May 30, 2023, claim seeking ₩399,734,850 (Korean Won) ($377,108.35 USD) for costs incurred prior to termination. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties agreed to submit these appeals on the record without a hearing pursuant to Board Rule 11.

FINDINGS OF FACT (FOF)

With their initial briefs, the parties submitted a Joint Statement of Stipulated Facts (JSSF). Our findings of fact, as set forth below, rely in part upon the parties' JSSF, as well as documents contained in the parties' respective Rule 4 submissions.[2]

---

[1] The contract was awarded to PNI INC and by Modification No. P00002 the contractor's name was changed from "PNI INC to PINEWOOD INC" (R4, tab 6 at 3). For simplicity's sake we refer herein to appellant as PNI.

[2] The government submitted an initial and supplemental Rule 4 file, which we refer to as R4, tabs 1-144. Appellant submitted an initial and supplemental Rule 4 file, which we refer to as app. supp R4, tabs 1-48.

Contract Award

1.  On July 13, 2022, PNI entered fixed price Contract No. W912UM-22-C0003 with the U.S. Army Corps of Engineers (USACE), Far East District (FED), in the amount of ₩1,851,555,146 (USD $1,746,750.15), for repair of the Contingency Fuel Delivery System on Osan Air Base, Republic of Korea (R4, tab 1 at 1-3, 6, tab 5 at 1; JSSF ¶¶ 1-2, 9).

Teaming Agreement Between PNI and Two Track, Inc.

2.  Prior to contract award, PNI entered a teaming agreement with Two Track, Inc. (Two Track), whereby Two Track would perform work on the project as PNI's subcontractor (R4, tab 7 at 1).  PNI and Two Track agreed "to combine their respective capabilities in a joint effort to submit said proposal for the Program and to complete the work required by any work statement in any contract . . ." (*id.*).

Project Description and Contract Line Items

3.  Contract specification paragraph 1.2.1, Project Description, required "construction of an approximately 330 meter long rail spur, shift of approximately 180 meters of the existing rail main track, realignment of approximately 80 meters of existing reinforced concrete box culvert, relocation of impacted utilities, and incidental related work" (R4, tab 5 at 13; JSSF ¶ 5).

4.  The contract includes six Contract Line Item Numbers (CLIN):  0001 Construct Rail Spur & Construct Site Preparation & Improvements (New Construction Work), 0002 Shift Existing Track & Site Work (Maintenance and Repair Work), 0003 Repair Drainage Facilities (Maintenance and Repair Work), 0004 Repair Electrical and Communications System (Maintenance and Repair Work), 0005 Repair Site Utilities (Maintenance and Repair Work), and 0006 Removals (Maintenance and Repair Work) (R4, tab 1 at 4).

FAR Provisions Incorporated into the Contract by Full Text or by Reference

5.  The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.236-15, SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984), which required the contractor, within five days of commencing work on the project, to prepare and submit to the CO for approval a construction schedule setting forth the order "in which the Contractor proposes to perform the work, and the dates on which the Contractor contemplates starting and completing the several salient

2

features of the work" (R4, tab 1 at 6);[3] FAR 52.236-15(a). FAR 52.236-15(b) specified that, if in the opinion of the CO the contractor fell behind the approved schedule, the contractor shall take steps necessary to improve its progress, including any steps required by the CO, such as increasing the number of shifts, overtime operations, days of work, as well as submission of supplementary schedules to demonstrate how the approved rate of progress will be regained. FAR 52.236-15(c) specified that the contractor's failure to comply with the CO's requirements shall be grounds (1) for determination by the CO that the contractor is not sufficiently prosecuting work necessary to ensure timely completion of the contract, and (2) a decision terminating the contractor's right to proceed with the work, in accordance with the default terms of the contract.

6. The contract incorporated by reference FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (MAY 2014), which provided, in part, under the subtitle, "Retainage," that "if satisfactory progress has not been made, the CO may retain a maximum of 10% of the amount of the payment until satisfactory progress is achieved" (R4, tab 1 at 6); FAR 52.232-5(e).

7. The contract incorporated by reference FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (default clause), which granted the government the authority to terminate the contractor's right to proceed if the contractor failed to prosecute the work with the diligence necessary to insure its completion within the time specified in the contract, as well as the right to "take possession of and use any materials, appliances, and plant on the work site necessary for completing the work" (R4, tab 1 at 6); FAR 52.249-10(a). The default clause also provided that "[i]f, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government." FAR 52.249-10(c).

8. The contract incorporated by full text FAR 52.211-12, LIQUIDATED DAMAGES -- CONSTRUCTION (SEP 2000), which provided, in part, "[i]f the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause" (R4, tab 1 at 7-8); FAR 52.211-12(b). The liquidated damages rate was ₩713,000 per calendar day" (R4, tab 1 at 8).

---

[3] Some documents in the government's Rule 4 file are stamped with Bates numbers beginning with zeros. We cite herein to those Bates numbers but omit the initial unnecessary zeros.

3

9.  The contract incorporated by reference FAR 52.236-13 Alt I, ACCIDENT PREVENTION (NOV 1991) – Alternate I (R4, tab 1 at 6).  In accordance with FAR 52.236-13, the contract also incorporated by reference the USACE Safety and Health Requirements Manual (EM) 385-1-1 (R4, tab 1 at 21, tab 5 at 61) (2014 Safety and Health Requirements Manual (EM) 385-1-1).  Specification Section 01 30 00, ADMINISTRATIVE REQUIREMENTS, likewise references EM 385-1-1 (R4, tab 5 at 19).  EM 385-1-1 contains two sections addressing temporary power plans: Section 4, Temporary Facilities, and Section 11, Electrical (R4, tab 142 at 68, 232).

10.  EM 385-1-1, Section 4, paragraph 04.A.01, states that plans for the layout of temporary construction buildings shall be submitted to and approved by the government designated authority (R4, tab 142 at 68).  EM 385-1-1, Section 11, Paragraph 11.E.01 addresses temporary wiring and lighting requirements and requires the contractor to submit to the government a sketch of proposed temporary power distribution systems before installing temporary power (R4, tab 142 at 244).

Submittals

11.  Specification Section 01 33 00, SUBMITTAL PROCEDURES, paragraph 1.2.1, Submittal Descriptions (SD), identified submittals the contractor was required to provide to the government prior to the start of construction (R4, tab 5 at 27).  The required submittals included (1) a list of proposed subcontractors, (2) a list of proposed products, (3) the construction progress schedule, (4) the submittal register, (5) a schedule of prices or Earned Value Report, (6) the health and safety plan, (7) the work plan, (8) the quality control (QC) plan, and (9) the environmental protection plan (*id.* at 27-28).[4]

12.  Specification Section 01 33 00, paragraph 1.1, SUMMARY, required the "Contractor's Quality Control (CQC) System Manager [CQCSM] to check and approve all items prior to submission and stamp, sign, and date indicating action taken" (R4, tab 5 at 27).

13.  Specification Section 01 50 00, TEMPORARY CONSTRUCTION FACILITIES AND CONTROLS, AND MISCELLANEOUS PROVISIONS, paragraph 1.2, SUBMITTALS, required the contractor to submit a construction site plan prior to beginning construction (R4, tab 5 at 127).  The site plan must include the locations and dimensions of temporary facilities to be used by the contractor, as well as access and haul routes, avenues of ingress/egress, safety and construction fences, site trailers, construction entrances, trash dumpster, temporary sanitary facilities, and worker parking areas (*id.*).

---

[4] A complete list of preconstruction submittals is set forth in the submittal register that appears at the end of Section 01 33 00 (R4, tab 5 at 43-46).

14.  Specification 02 41 00, DEMOLITION, paragraph 1.6, SUBMITTALS, required the contractor to "prepare a Demolition plan and submit proposed salvage, demolition, and removal procedures for approval before work is started" (R4, tab 5 at 179,181).

15.  Specification Section 31 00 00, EARTHWORK, paragraph 1.4.3, Dewatering Work Plan, and paragraph 1.5, SUBMITTALS, required the contractor to submit its shoring plan and its dewatering work plan (R4, tab 5 at 235, 240). Paragraph 3.5.1, General Requirements, directed the contractor to "[s]ubmit a Shoring and Sheeting plan for approval 15 days prior to starting work," and required "drawings and calculations [be] certified by a registered professional engineer, describing the methods for shoring and sheeting of excavations" (R5, tab 5 at 248).

16.  Specification Section 33 71 02, UNDERGROUND ELECTRICAL DISTRIBUTION, paragraph 1.3, SUBMITTALS, required the contractor to submit shop drawings setting forth details for the precast underground structures and several product data submittals (R4, tab 5 at 383-84).

17.  Specification Section 01 11 00, paragraph 1.4, LOCATION OF UNDERGROUND UTILITIES, required the contractor to obtain digging permits from Osan Air Base prior to the start of excavation and to contact the local utility locating service 48 hours prior to excavation (R4, tab 5 at 13).

18.  Specification Section 01 33 00, paragraph 1.11.1, Review Notations, required CO submittal review be completed within 30 calendar days after date of submission, with the submittal:  marked approve or accepted authorizing the contractor to work; "approved as noted" authorizing the contractor to proceed with work covered provided the contractor takes no exception to the corrections; or "not approved" or "disapproved" indicating noncompliance with the contract requirements.  Paragraph 1.11.1(c) states that the contractor must resubmit, with appropriate changes, submittals not otherwise approved, and that "[n]o work shall proceed for this item until resubmittal is approved."  (R4, tab 5 at 39-40)

Construction Schedules

19.  Specification Section 01 32 16.00 20, SMALL PROJECT CONSTRUCTION PROGRESS SCHEDULES, paragraph 1.2, ACCEPTANCE, required the contractor, prior to the start of work, to prepare and submit to the CO for acceptance a construction schedule in the form of a bar chart schedule in accordance with FAR 52.236-15 (R4, tab 5 at 23).  Acceptance of the baseline construction schedule is a condition precedent to the contractor starting work on demolition or construction, the processing of contractor invoices, and the review of schedule updates (*id.*).  By submitting the baseline construction schedule, and schedule updates, the

5

contractor certifies "that the submitted schedule meets all of the requirements of the Contract Documents, represents the Contractor's plan on how the work will be accomplished, and accurately reflects the work that has been accomplished and how it was sequenced (as-built logic)" (*id.*).

20. Specification Section 01 32 16.00 20, paragraph 1.3.1, Bar Chart Schedule, requires that the schedule bar chart indicate "work activities, submittals, Government review periods, material/equipment delivery, utility outages, on-site construction, inspection, testing, and closeout activities" (R4, tab 5 at 23).

21. Specification Section 01 32 16.00 20, paragraph 1.4, SCHEDULE MONTHLY UPDATES, required the contractor to update the construction schedule monthly or when the schedule was revised, "reflecting actual activity progress and plan for completing the remaining work" (R4, tab 24). The schedule's narrative report was to include (1) progress made in each area of the project, (2) the critical path, (3) any date/time constraint(s), other than those required by the contract, (4) changes in added or deleted activities, original and remaining durations for activities that have not started, logic, milestones, planned sequence of operations, (5) status of the contract completion date (CCD) and interim milestones, (6) current and anticipated delays, including the cause of delay and any corrective actions(s) and mitigation measures, and (7) description of current and future schedule problem areas (*id.*).

22. Specification Section 01 32 16.00 20, paragraph 1.5, 3-WEEK LOOK AHEAD SCHEDULE, required the contractor "[p]repare and issue a 3-Week Look Ahead schedule to provide a more detailed day-to-day plan of upcoming work identified on the Construction Schedule" (R4, tab 5 at 24). The look ahead schedule required the contractor to "[i]dentify critical path activities" and specified that "[a]ctivities must not exceed 5 working days in duration and have sufficient level of detail to assign crews, tools and equipment required to complete the work" (*id.*).

Project Boundaries Encroaching on AAFES Taxi Yard

23. Two contract drawings depict the project boundaries and the Contingency Fuel Delivery System rail spur (R4, tab 4 at 5-6; JSSF ¶¶ 7-8). The project boundaries of the Fuel Delivery System rail spur encroach on a taxi yard utilized by the Army and Air Force Exchange Service (AAFES) taxi dispatching service and HaeKang taxi (R4, tab 32 at 2, tab 65 at 29; JSSF ¶ 10). Specifically, one end of the existing concrete culvert was buried under the AAFES taxi parking lot (R4, tab 4 at 33). As is evident from comparing the referenced contract drawings, and as noted by the CO, the taxi yard/parking lot is a small portion of the entire project site (R4, tab 32 at 2, tab 65 at 29, tab 141 at 5).

6

24.  By email dated March 4, 2021—prior to contract award—an Air Force engineer informed the AAFES General Manager that the USACE planned repair project would permanently encroach upon the Osan AAFES taxi parking lot (R4, tab 65 at 22; JSSF ¶ 11).  The email included a map displaying the encroachment with two lines; a blue line indicating the permanent encroachment of the project and a red dotted line indicating the project's temporary impact on the AAFES taxi parking lot during the planned construction (R4, tab 32 at 2; JSSF ¶ 12).

Notice to Proceed/CCD

25.  By letter dated July 26, 2022, FED issued the Notice to Proceed (NTP) instructing PNI to commence work within 10 calendar days of receipt of the NTP and to complete work in accordance with the schedule set forth in FAR 52.211-10 (R4, tab 1 at 7, tab 3; JSSF ¶¶ 3-4, 13).  The CCD was May 22, 2023, which was 300 calendar days from the date the NTP was issued (R4, tab 1 at 7, tab 3 at 1; JSSF ¶ 14).

Contract Performance – PNI's Late Start and FED's Letter of Concern

26.  By internal government email dated August 1, 2022, the CO's representative (COR) expressed concern that "PNI is not approved by KORAIL to do rail work, so their proposal would have included a partnering agreement with a KORAIL-approved subcontractor," and requested a copy of the partnering agreement to include in the pre-construction meeting" (R4, tab 8).

27.  By letter dated August 25, 2022, the COR expressed concern that, one month into the project, the government "has not heard from PNI's team for this project" except for PNI's attendance at the preconstruction meeting (R4, tab 9).  The COR noted that the government had yet to receive any contract required submissions, including the quality control plan, the waste management plan, joint inventory request, the preliminary schedule, or a request for base access passes, field office location and work permits (*id.*).  The COR also noted (1) that the government "requires time to review each document, and [PNI's] physical work cannot start until all appropriate preconstruction documents are approved," and (2) "that this project may already be delayed, at no fault of the Government" (*id.*).

28.  By letter dated August 29, 2022, PNI responded to the COR's letter of concern, acknowledging it was "late to start this project," as well as its late submissions "due to the late manning for this project" (R4, tab 10).  PNI provided dates of August 31, 2022, and September 8, 2022, for submission of its preconstruction documents and stated that it would begin mobilization on the project

after completion of CHU-SOK (Korean Thanksgiving Day), which that year fell on September 9-12 (*id.*).[5]

Initial Plan/Schedule Submissions – Request for Site Release

29.  On August 31, 2022, PNI submitted its safety plan (R4, tab 12; JSSF ¶ 16), its CQC plan (R4, tab 11; JSSF ¶ 16), and its preliminary Network Analysis Schedule (NAS) (R4, tab 14; JSSF ¶ 16) (PNI Serial Letter S-0005).[6]  On August 31, 2022, PNI also requested site release at USACE's earliest convenience but no later than September 15, 2022 (R4, tab 13; JSSF ¶ 15).

30.  On September 5, 2022, PNI submitted its demolition plan (R4, tab 15; JSSF ¶ 16).

31.  On September 7, 2022, PNI submitted its temporary power plan and field office plan (R4, tab 17; JSSF ¶ 16).

32.  On September 13, 2022, PNI submitted its erosion plan (R4, tab 18; JSSF ¶ 16).

33.  By letter dated September 14, 2022, the COR approved PNI's quality control plan, although additional changes were required, including a discussion of "Two Track's organization, the partnering agreement, appointments letter[s] signed by authorized official[s] of Two Track, and description of the responsibilities and authorities that Two Track will carry as opposed to PNI during this project" (R4, tab 19).

PNI's Construction Schedule

34.  On September 14, 2022, PNI submitted its construction schedule (NAS), which PNI termed its "Initial Construction Schedule" (R4, tab 20 (PNI Serial Letter S-0010); JSSF ¶ 17).  PNI's construction schedule identified five critical path items: (1)  86 days to conduct removal work, from NTP, July 26, 2022, through October 19,

---

[5] https://www.90daykorean.com/chuseok-in-korea (accessed November 25, 2024).

[6] Beginning with its August 31, 2022, submission, appellant labelled its construction schedule a Network Analysis Schedule (NAS), although we note that the contract specifications do not specifically utilize that terminology.  Similar to the schedule requirement set forth in pertinent specifications here (FOF ¶¶ 5, 19-21), a NAS ties the schedule of events to the contract's critical path, updated monthly.  *Hedgecock Elec., Inc.*, ASBCA No. 56307, 12-1 BCA ¶ 35,086 at 172,304; *Nova Grp., Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,329.

2022, (2) 68 days to conduct water line work through culvert work from October 20, 2022, through December 26, 2022, (3) 47 days to conduct utility line work, from December 27, 2022, through February 11, 2023, (4) 74 days to conduct the rail spur work, from February 12, 2023, through April 26, 2023, and (5) 25 days to conduct inspections and turn over the project, from April 27, 2023, through May 22, 2023 (R4, tab 20 at 8; JSSF ¶¶ 18-23).

### PNI Demolition Plan – FED Response

35. On September 16, 2022, USACE responded via Serial Letter C-0003, disapproving PNI's demolition plan dated September 5, 2022, stating that PNI's plan needed to address the following: the plan needed to (1) be in coordination with specification 01 74 19, Construction and Demolition Waste Management Plan, (2) include an environmental protection plan specification section, (3) include a column of actual quantities of major items to be demolished for tracking purposes, (4) identify the competent person and credentials, (5) include a statement how to handle found items of apparent historical or archaeological interest, (6) include a section concerning stormwater pollution and erosion/sediment control, (7) include a section about scrap materials and items to be disposed of through the Osan AB Qualified Recycling Program, and (8) include procedures for reporting waste removal from base (R4, tab 21).

36. On September 20, 2022, PNI resubmitted its demolition plan (R4, tab 23; JSSF ¶ 24).

### PNI Preliminary Schedule and Initial Construction Schedule

37. On September 20, 2022, the COR issued Serial Letter C-0004 (R4, tab 22), approving PNI's August 31, 2022, preliminary NAS (*see* FOF ¶ 29, PNI Serial Letter S-0005 (R4, tab 14)), but disapproving PNI's September 14, 2022, initial project construction schedule (*see* FOF ¶ 34, PNI Serial Letter S-0010 (R4, tab 20)). The COR encouraged PNI to contact Mr. Jong Won Lee, FED's scheduler, should PNI have any questions (R4, tab 22). The schedule review memorandum noted PNI's noncompliance with scheduling requirements set forth in specification Section 01 32 01.00 10, including: (1) the project schedule must include a start milestone titled "NTP acknowledged" with a "start on" date equal to the date that the NTP is acknowledged; PNI did not identify the requisite "start on" date, (2) PNI listed two activity names, C50020 and C50050 with the same name: "ballast laying w/Comp;" these two activity names should be unique, (3) PNI's schedule did not list the mandatory tasks health and safety plan, and mobilization, (4) PNI was not to cost load mobilization, submittals, temporary installation work or government activities, yet PNI had budgeted ₩25,916,000 for the activity of installing the temporary office with fencing, (5) cost loading the "correction of punch list from the Government pre-final

9

inspection" activity cannot be less than one percent of the present contract value (PNI budgeted correction of prefinal deficiency for ₩9,248,658), and (6) PNI left the "must finish by" schedule date blank; PNI needed to identify CCD as the "must finish by" date (R4, tab 139 at 1-2).

### Temporary Power Plan and Field Office Submission - FED Response

38. On September 21, 2022, USACE issued Serial Letter C-0005 disapproving PNI's September 7, 2022, temporary power plan and field office submission, stating that the chosen location is the AAFES taxi parking lot and encompasses two buildings AAFES currently had in use (R4, tab 24). USACE suggested PNI review its emails to locate "communication regarding the AAFES taxi parking lot, along with a google earth screen shot that shows where you might locate your offices" and that PNI resubmit its field office plan with pictures oft the site and drawn outlines indicating where different structures will be placed so the 51st[t] Civil Engineer Squadron (51CES) can review the plans and clear out the site area before PNI moves into the area (*id.*).

### Erosion Control, Demolition, Waste Management Plans – FED Response

39. On September 23, 2022, USACE issued Serial letter C-0007 approving PNI's erosion control plan, demolition plan resubmission, and waste management plan but noting five items that needed to be added to the waste management plan (R4, tab 28).

### Site Release

40. On September 23, 2022, the Air Force (the using agency), approved site release (R4, tab 29). On September 26, 2022, USACE issued Serial letter C-0008 responding to PNI's Request for Site Release and included the Air Force's site release memorandum (R4, tab 31; JSSF ¶¶ 25-26). The COR noted that the suggested lay-down area in the contract drawings was being used for storage by the 51CES and anticipated that the stored items would be removed by October 7, 2022 (R4, tab 31). The COR noted, however, that "[t]he main construction location of the train tracks should cause you [PNI] no issue" (*id.*).

### PNI Construction Schedule

41. On September 26, 2022, PNI resubmitted its initial construction schedule (labeled incorrectly by PNI as its "preliminary schedule (NAS)") (R4, tab 30; *see also* R4, tab 22 (September 20, 2022, Serial Letter C-0004, approving PNI's "preliminary schedule and disapproving its construction schedule)).

42. On September 29, 2022, USACE conditionally accepted PNI's revised, September 26, 2022, initial schedule (project construction schedule), noting that PNI should change the CCD to include a "'[f]inish on or [b]efore' constraint date" (R4, tab 38).

### FED Response to Temporary Power Plan and Field Office Submission

43. On September 29, 2022, USACE responded via Serial Letter C-0010 to PNI's re-submission of its request for approval of its field office, providing additional comments and questions, and directing PNI to resubmit its field office and temporary power plan with information regarding specific power connections and location of the electrical panel (R4, tab 37).

### Site Visit and Work Items Requiring Completion

44. On October 14, 2022, USACE issued Serial Letter C-0012 noting that a site visit had taken place on October 12, 2022, and the Air Force user had not vacated the site by October 7, 2022, as the Air Force had previously stated (R4, tab 39; JSSF ¶ 27). The COR detailed several work items that PNI had yet to satisfactorily complete, including PNI's field office and temporary power plan (the field office plan lacked sufficient detail, the office extended outside the site boundaries, and structures were placed atop of the underground utilities that needed rerouting) (R4, tab 39 at 1). The COR expressed concern about PNI staff turnover, submission of PNI's submittal register, and the need for an updated schedule (*id.* at 1-2). The COR also noted the absence of Two Track personnel at the site, stating that FED expected Two Track to be involved in the project, and that "[w]hile PNI is the prime contractor, a Two Track representative must be on site, as they are the expert in construction rail lines (including space needed for material and actual work)" (*id.*).

### Continued Field Office/Site Issues

45. By email dated October 17, 2022, Roy Tongue, FED quality assurance representative (QAR), expressed concern about PNI's lack of approved field office plans, noting that the Air Force had removed all the required material and equipment from the yard, but that, without an approved plan, PNI could not begin delivery and installation of temporary structures (app. supp. R4, tab 6).

46. By email dated October 19, 2022, the FED QAR informed PNI about continuing efforts to coordinate a meeting between AAFES and HaeKang Taxi concerning PNI's mobilization and subsequent construction activities (R4, tab 65 at 29; JSSF ¶ 28). In anticipation of that meeting, the QAR requested PNI provide a copy of its "detailed Construction site plan and power distribution sketch" (R4, tab 65 at 29).

<u>FED's Continued Concern Regarding PNI's Lack of Progress</u>

47.  During a meeting on October 26, 2022, FED expressed its "dissatisfaction for the lack of concern PNI has been showing at the beginning of the project," PNI's lack of follow up, and the need for better communication from PNI (R4, tab 42 at 1). FED's QAR discussed PNI's sequence of work for storm drainage and utilities, noting that PNI's approved critical path schedule states that PNI will relocate the box culvert, and that the "schedule might be impossible" because the relocation area had existing utilities (*id.*).  FED also discussed its concern about the lack of involvement by Two Track (*id.*).

<u>Base Pass Issue and Need for Revised Schedule</u>

48.  By email dated November 7, 2022, USACE memorialized a meeting on November 7, 2022, during which PNI  stated it had not received base passes originally requested on September 20, 2022; the USACE letter stated that "[t]his delayed access to the base may be considered a concurrent delay, pending FED's receipt of an Updated Schedule and Time Impact Analysis (TIA)" (R4, tab 45; JSSF ¶ 31). Regarding the need for a revised schedule, USACE requested that PNI respond to Serial Letter C-0012, and subsequent emails, as well as information requested in an October 26, 2022, meeting, to provide "an updated schedule due to PNI's delayed start to this project" (R4, tab 45).  USACE noted that PNI was 26% behind schedule, and that it was "not clear how PNI can make up for lost time," because "[n]o submittals have been sent to FED and the PNI has not sufficiently explained how there is enough critical path work to be completed while processing off-shore material orders" (*id.*). USACE informed PNI that, because "there continues to be lack of progress and lack of responses to our requests, PNI could expect an official Cure letter from FED Contracting" (*id.*).

<u>Excavation Work and Digging Permits</u>

49.  On November 23, 2022, PNI assembled preparatory inspection material for excavation work, checked the status of the digging permit, and marked lines for both the existing and replacement culvert (R4, tab 91 (QC Daily Report No. 120); JSSF ¶ 33).

<u>Concrete Culvert Plan</u>

50.  On November 26, 2022, PNI submitted to FED its concrete culvert plan and drawings (app. supp. R4, tab 11; JSSF ¶ 35).

51.  By letter dated November 29, 2022, the USACE again requested PNI provide an updated construction schedule, noting that two months had passed since the government had approved PNI's September 20, 2022, revised construction schedule (R4, tab 47).  The letter also informed PNI the revised construction schedule was needed to assist the government in PNI's gaining access to the AAFES taxi yard, allowing for "coordination of specific work or to set deadlines for 51CES to completely empty the yard before your schedule is impacted" (*id.*).  USACE noted that because the government does "not have an accurate schedule with correct logic and a viable catch-up plan, it is difficult to coordinate anything with the base" (*id.*).

52.  The project engineer/COR met with PNI on December 2, 2022, to discuss the need for a revised construction schedule (R4, tab 49 at 1-2).  Topics discussed during that meeting included the issue of "cut-over (comm/power outages)" which "must be coordinated a minimum 4-weeks in advance," and which "cannot be started without an approved plan" (*id.* at 1).  The COR noted that the current dates for "comm cutover" were impossible to meet for coordination purposes and "improbable for PNI to be prepared for based on the provided schedule" (*id.*).  An additional topic discussed was that between the schedule items of "Completion of the Utility Cutover and Culvert Box installation, there is a missing task of demolition of old comm/power lines" (*id.*).  The COR noted that PNI "previously mentioned that the existing box culvert can be demoed immediately, but I do not see that on this schedule" (*id.*).

Preparation for Preliminary Inspection re:  Demolition Work and Earthwork

53.  On December 9, 2022, PNI continued preparation for the preliminary inspection regarding demolition work and earthwork and checked the status of the culvert outlet located outside the base (R4, tab 101 (QC Daily Report No. 136); JSSF ¶ 40).

54.  On December 13, 2022, PNI conducted its preliminary inspection of demolition, drafted RFI-001 on changing the telecommunication line, and inquired about preparing the shoring and dewatering plan early (R4, tab 103 (QC Daily Report No. 140)).

Review of Concrete Culvert Submittal

55.  By email dated December 13, 2022, the project engineer requested that FED civil engineers review the concrete culvert submittal/shop drawing (R4, tab 65 at 105-06).  The following day, the FED quality assurance branch transmitted the submittal to FED engineers (*id.* at 105; JSSF ¶ 36).

Dewatering Work Plan

56.  According to PNI's quality control representative (QCR), on December 19, 2022, PNI submitted its revised NAS, prepared submittals of four items, and submitted its dewatering plan (R4, tab 107 (QC Daily Report No. 146)).  The record contains a document titled "Dewatering Work Plan" dated January 17, 2022 (app. supp. R4, tab 1).[7]  The dewatering work plan includes slides depicting three sections of the culvert, specifically the center section of the culvert that PNI was to replace and the sections on either end that were to remain on site (*id.* at 6), as well as a depiction of the three culvert sections with piping connecting the "east" remaining culvert to the "west" remaining culvert with a notation "SEWER (from East toward West)" (*id.* at 8).

PNI Begins Removal Work

57.  On December 20, 2022, PNI began removal work (construction activity 10030); the government conducted its initial inspection and noted that PNI performed the work in compliance with the procedures discussed during the preliminary inspection (R4, tab 119 (QA Daily Report No. 147); JSSF ¶ 41).

Government Rejects PNI's Resubmitted Schedule(s)

58.  By Serial Letter C-0018 dated December 21, 2022, the project engineer/COR rejected PNI's resubmitted NAS, noting that PNI recently had submitted additional iterations of its schedule:  (1) NAS 2 via email on December 1, 2022; (2) revised partial NAS 3 in bar chart form on December 2, 2022; and (3) a reformatted and edited NAS 3, resubmitted as NAS 4 on  December 19, 2022 (R4, tab 52).  The COR stated that PNI had not explained sufficiently its changes from NAS 1 to NAS 4, the cause of the delay, or how PNI intended to regain progress (*id.*).  The COR stated that NAS 4 was unacceptable as there was no monthly schedule update based on the current CCD of May 2023.  The COR expressed concern about (1) the lack of progress and delayed delivery of schedule updates, (2) the need to receive a schedule which reflects actual progress against the baseline schedule and provides a critical path leading to timeline completion, and (3) the need for PNI to state how it intended to finish the remaining work in the allotted time, including its means and methods to regain lost time with the 152 days remaining (*id.*).  The government reminded PNI that the NAS narrative report should set forth progress

_____

[7] It is not clear from the record submitted by the parties whether this January 17, 2022, document is the dewatering plan submitted by appellant as noted in PNI's December 19, 2022, QCR.  We note also that appellant's initial brief includes, reproduced in the text of its brief at pages 16-23, a different version of PNI's January 17, 2022, dewatering work plan, which contains two pages not set forth in the Rule 4 version of the document (*see* app. br. at 18-19).

made in each area of the project, the critical path, date/time constraints, changes or activities, duration, logic, milestones, status of the CCD and interim milestones, delays, and future schedule areas (*id.*).

Status of Taxis Located on Taxi Yard/ Miscellaneous Work

59. On December 21, 2022, the FED QAR noted that 21 taxis were currently parked within the project boundary and would be relocated prior to December 25, 2022, and that by the end of the day nine taxis already had been relocated (R4, tab 120 (QA Daily Report No. 148); JSSF ¶ 42).

60. On December 22, 2022, the FED QAR verbally notified PNI that the 12 remaining taxis parked in the project boundary would be relocated prior to December 25, 2022 (R4, tab 121 (QA Daily Report No. 149); JSSF ¶ 45).

61. On December 23, 2022, PNI worked on its first payment request and installed a silt fence at the project site. Two Track workers visited the site to check site conditions. PNI also submitted RFI-002 concerning a change to electrical cable gauge. (R4, tab 111 (QC Daily Report No. 150))

62. On December 26, 2022, the taxi area parking zone was cleared. PNI set a fence and shielding net and removed an existing concrete curb and asphalt concrete located beside the train spur. (R4, tab 112 (QC Daily Report No. 153); JSSF ¶ 46)

Continued Preliminary Construction Activities

63. On December 27, 2022, PNI installed plastic barricades between the project site and AAFES taxi yard, installed silt fencing, set additional shield netting, and moved to a corner of the project site a transformer oil box and concrete barricades in the taxi area (R4, tab 113 (QC Daily Report No. 154), tab 122 (QA Daily Report No. 154); JSSF ¶¶ 47-48). The FED QAR noted that PNI's demolition work was progressing slower than expected based upon the three-week look ahead schedule that PNI had provided during the December 21, 2022, weekly meeting (R4, tab 122).

64. On December 28, 2022, PNI continued its preliminary construction activities of installing plastic barricades, relocating a transformer, and bringing a wheeled excavator on site to break up a concrete retaining wall (R4, tab 114 (QC Daily Report No. 155), tab 123 (QA Daily Report No. 155); JSSF ¶ 49).

65. On December 29-30, 2022, PNI continued preliminary construction activities, breaking asphalt concrete in the taxi yard, removing broken asphalt concrete beside the railroad, installing field office wire bracing, clearing the site, and arranging

removed materials (R4, tab 115 (QC Daily Report No. 156), tab 116 (QC Daily Report No. 157); JSSF ¶ 50).

66. On January 4, 2023, PNI removed asphalt concrete into a dumpster brought on site, spread gravel, and set safety warning rope along the retaining wall at the taxi parking area (R4, tab 117 (QC Daily Report No. 162); JSSF ¶ 51).

Culvert Shoring Plan

67. On January 4, 2023, PNI and the USACE held a weekly progress meeting, wherein the parties discussed PNI's continued work on its shoring plan, which in turn, was "delaying the scheduled start of activity C30005 – Shoring for Culvert" (R4, tab 126 (QA Daily Report No. 162)). At the meeting, "PNI expressed confusion about how to properly prepare a schedule update to include anticipated adverse weather days, actual progress, and a descriptive narrative to explain the current delays and plans to correct them" (id.). The FED QAR recommended that PNI contact Mr. Jong Won Lee, FED's scheduler, just as the government had recommended to PNI in Serial Letter C-0004 on September 20, 2022 (id.; see FOF ¶ 37).

68. On January 5, 2023, PNI conducted demolition work and loaded broken asphalt debris into dump trucks (R4, tab 118 (QC Daily Report No. 163), tab 127 (QA Daily Report No. 163); JSSF ¶ 52).

PNI Preliminary Inspection Requested and Cancelled

69. By email dated January 5, 2023, PNI sought approval for a preparatory inspection the following day, January 6, 2023 (app. supp. R4, tab 25 at 1; JSSF ¶ 53). The FED QAR responded that a preliminary inspection was possible and asked which feature of work the preliminary inspection would cover (app. supp R4, tab 25 at 1; JSSF ¶ 54).

70. On January 6, 2023, PNI informed the government "we can't execute additional activity" as the "dewatering plan, shoring plan, elec and comm shop drawing are not submitted and these feature of work's [sic] concerned submittals are also not approved" (app. supp R4, tab 25 at 1). Instead, PNI requested, "if possible after earthwork PI, we want to check the exact existing utility lines and prepare new install line trenches and digging the elec precast M/H install location" (id.; JSSF ¶¶ 55-56).

71. By email dated January 6, 2023, the FED QAR informed PNI "[u]nder the current circumstances and after careful consideration by the ACO, FED does not concur with PNI['s] intent to conduct a Preparatory Inspection for Earthwork" (app. supp R4, tab 25 at 1-2; JSSF ¶ 57). The QAR's decision was "based on PNI[']s

16

admitted lack of preparation, the potential for confusion of performing an abbreviated PI for limited activity, and a general lack of timely coordination by PNI staff" (app. supp R4, tab 25 at 2; JSSF ¶ 57). The QAR added, "[w]e feel it is imprudent to conduct a PI for Earthwork until PNI has all associated plans and submittals approved for this feature of work" (app. supp R4, tab 25 at 2; JSSF ¶ 57).

72. On January 6, 2023, PNI conducted demolition work, loading broken asphalt debris into dump trucks (R4, tab 128 (QA Daily Report No. 164); JSSF ¶ 58).

Show Cause Letter

73. On January 9, 2023, the CO issued a show cause letter, stating it had been 160 days since issuance of the NTP, leaving less than 141 days to substantially complete all work (R4, tab 54; JSSF ¶¶ 59-60). The show cause letter noted the government's repeated warning letters regarding PNI's need to cure deficiencies in its performance, stating, PNI had "executed very minimal physical work on the project," and had "not demonstrated any effort to increase crew sizes, extend shifts, or requested permission to work weekends" (R4, tab 54 at 2).

74. The show cause letter stated that PNI had not provided adequate responses to government notices that PNI was "not properly proceeding with the necessary preparatory activities by which to start work" (R4, tab 54 at 2). The government provided as an example that "there has been minimal evidence" of Two Track's (PNI's subcontractor) "actual involvement in this project, despite the requirement that [PNI] demonstrate its involvement" (*id.*).

75. The show cause letter noted that since issuance of the NTP, PNI had four different CQCSMs on the project, with the latest officially appointed on December 1, 2022, and that "[t]he high turnover rate of key staff members has contributed to PNI self-inflicted delays in procuring base passes and developing timely submittals" (R4, tab 54 at 2). The government also noted that the ability to staff "a project delivery team and develop momentum is crucial to the successful and timely prosecution of construction projects," and that PNI's "false starts and stumbles only reinforce [USACE's] increasing skepticism of PNI's capability to deliver on time" (*id.*).

76. Regarding timely submittals, the CO expressed concern about PNI's ability and competency "to consistently develop accurate quality control documentation without Government assistance," noting that during mobilization PNI was "required to revise and resubmit several major submittals [including the] Accident Prevention Plan, Demolition Plan, Field Office Plan, and Temporary Power Plan due to egregious errors and omissions," and that "multiple submittals for materials have displayed multiple errors, omissions, and a general lack of attention to detail which require correction and resubmission" (R4, tab 54 at 2).

77. Regarding scheduling, the government noted PNI's inability to submit an acceptable schedule for work performed under the contract. The government noted that, on December 21, 2022, via Serial Letter C-0018, PNI was informed that its "4th NAS submission is still unacceptable primarily because [PNI] arbitrarily extended the CCD to August 2023," and that PNI's "payment application for December was rejected based on gross errors and omissions in the NAS update and narrative" (R4, tab 54 at 2-3). The CO stated that PNI had "neither officially submitted any evidence or explanation concerning why your firm has been delayed in progressing with the work due nor have you provided any written notice to the KO/ACO of any potentially compensable delays," concluding "it is now impossible for your firm to complete the required work in the time remaining without a substantial time extension for Government or other caused delay" (*id.* at 3).

78. The government's January 9, 2023, QA report notes that PNI "has effectively completed progress on all activities which have approved submittals," that "[t]he majority of submittals to date have either been returned for corrections or rejected completely," that the "[m]ajor outstanding submittals that are either in review, have been returned, or have not been submitted include dewatering, shoring, and underground electrical distribution shop drawings," and that all "these submittals are associated with activities on the critical path which, based on the original baseline schedule, should already be started or completed by today[']s date) (R4, tab 129 (QA Daily Report No. 167)).

Concrete Culvert Submittal

79. On January 13, 2023, the government requested PNI retransmit the concrete culvert plan and drawing because the previous version was unreadable in places (R4, tab 65 at 104). The parties agree that PNI complied immediately with the request (JSSF ¶ 38).[8]

80. On January 16, 2023, PNI requested permission to conduct concrete testing (R4, tab 59; JSSF ¶ 61).

PNI Response to Show Cause Letter

81. On January 20, 2023, PNI submitted Serial Letter C-0019 in response to USACE's show cause letter (R4, tab 60; JSSF ¶ 62). The cover letter recognized that PNI had "met with some difficulty in the subject FED project," noting that "it was not easy to find the key personnel as this project is the small contract amount & short working period" (R4, tab 60 at 1). PNI stated that "[t]he corrective action plan is

---

[8] The government had neither approved nor disapproved the culvert plan at the time of contract termination (JSSF ¶ 39).

18

composed of the improvement of key personnel management, reasonable NAS update, improvement of submittals procedure, catch up plan, etc." (*id.*; *see also* JSSF ¶ 63).

82. PNI's corrective action plan identified "some delaying factors," specifically (1) "[t]he construction site has been released partially except taxi way," (2) difficulty accessing the project site, mobilizing the site office (including installation of temporary fence for the site office), because of delays in receiving base passes, and (3) "limited place for the contractor to perform the paper work due to the delay on issuing pass and ID" (R4, tab 60 at 5). PNI also recognized that "despite of some delaying factors, we acknowledge that PNI should be the one who is responsible for some delay" (*id.*).

83. PNI's corrective action plan set forth its plans to improve key personnel management, provide reasonable NAS updates, improve its submittals procedures, and improve management (R4, tab 60 at 5-6). Regarding improvement of key personnel, PNI stated it would increase the number of personnel from three ("PM, CQCSM, SSHO") to at least seven ("PM, CQCSM, SSHO, Alt. CQCSM, Civil team QCs, admin") (*id.* at 5). Regarding improved submittals, PNI stated it "would resubmit the submittal register which would be a [sic] way more actuate than previous one[,] incl. submittal due date and keep on following the revised submittal register," with the new version prepared by three personnel from the CQCSM team (as opposed to one) with an additional review before submitting to the government (*id.* at 6). Regarding improved scheduling, PNI submitted an updated NAS and pledged a scheduler for the "project would visit the job site at least 2 times a week to check the progress" (*id.*). Regarding improved management, PNI stated it would increase manpower and work evenings and weekends (*id.*). PNI also stated "[s]ince the contractor made the mistake to the government, contractor would keep the above submittal date and keep the submitted date after contractor [received] approval from the government," adding "there's no excuse on delaying," and that PNI's "headquarter[s] also would put more attention to our project and also do our best to support the construction site" (*id.* at 6-7).

Suspension of Work/Termination for Default

84. On February 16, 2023, USACE issued a suspension of work (R4, tab 61; JSSF ¶ 65). By email dated February 17, 2023, USACE informed PNI the contract was terminated for default (R4, tab 62; JSSF ¶ 67). The accompanying notice based termination on PNI's delay and failure to meet the contract's schedule and failure to provide acceptable schedule updates and corrective action plans (R4, tab 63; JSSF ¶ 68). The CO noted that, based upon progress to date, "PNI will fail to meet the current CCD by at least 108 days" and that the government stands to be substantially damaged by PNI's failure to timely perform, putting the 51st Fighter Wing's mission

19

and readiness at risk as the rail line is a contingency fuel-delivery system (R4, tab 63 at 1).

85. The CO issued a seven-page determination and findings memorandum, also dated February 17, 2023, setting forth support for the default termination based upon PNI's failure to make reasonable progress (R4, tab 141 at 1). The CO found no merit in PNI's argument that it was delayed due to late release of the taxi yard because the parking lot work represented a small percentage of the entire project site and work there consisted primarily of rerouting underground utilities. The CO stated that "PNI has been unprepared to do any work, except demolition, thru February 2023." (R4, tab 141 at 5; JSSF ¶ 66; *see* FOF ¶ 23) The CO likewise noted that (1) "[t]he same utility work (e.g., surveying, test digging, and trenching) must be performed in the yard PNI has occupied since October 2022," (2) "PNI has not performed any work in either area since this project started," (3) because "PNI did not submit any schedule updates, respond to the serial letter/meeting minutes, or address the work-sequencing issue, any claim of Government-cause delay could not be assessed," and (4) PNI has not "completed submittals or plans (e.g., shoring, de-watering, and utility-rerouting) that are required to hold the Preparatory Inspection prior to any work." The CO also noted that "PNI's schedule update, received by FED's scheduler on 11 January 2023, shows no Government-cause delay." (*Id.*)

86. Regarding the issue of base passes, the CO found no merit, stating that the contract assigned the contractor the responsibility "to submit a base pass request no later than five (5) calendar days after award of the contract," that PNI submitted four base passes to USACE on September 1, 2022, which USACE signed on September 6, 2022, but were not retrieved by PNI until September 20, 2022 (R4, tab 141 at 5).[9]

87. Regarding key personnel, the CO noted that "[t]he alternate CQCSM would be the 5th CQCSM associated with this project" and that the resume attached to PNI's response indicates work primarily on smaller 411th CSB [Contracting Support Brigade] projects, with limited experience on FED projects (R4, tab 141 at 5). The CO expressed concern that "since poor submittal quality and lack of understanding FED's processes is a part of PNI's performance, this response displays a lack of comprehension of PNI's problem" (*id.*).

88. Regarding improved submittal management, the CO noted that "[r]esubmitting the submittal register as PNI intends would not resolve the problem of poor submittal quality" and that PNI's response "confirms that the 4th CQCSM (hired in November 2022) was the only person working on submittals" which "supports the

_____

[9] We note that neither PNI's initial brief nor its reply brief argue government delay in issuance of base passes as a basis upon which to excuse PNI's failure to make progress.

fact that PNI did not have enough experienced staff members on this project" (R4, tab 141 at 6).

89. Regarding schedule issues, the CO noted that "an updated schedule was requested multiple times throughout this project" and that PNI was "unable to provide an updated schedule for the duration of this project" (R4, tab 141 at 6). The revised schedule PNI submitted with its response to the show cause letter was deficient as it did not include the narrative required by the contract, included an added activity called "Final Site Release," that attempted to fault the government for 3-months of delay, yet "a basic review of the schedule still showed there is no Government-caused delay" (*id.*).

90. Regarding improved management, the CO stated that PNI's plan was "not specific enough to be considered" as PNI had yet to follow through on the two items listed, weekend work and submission of a winterization plan (R4, tab 141 at 6). The CO noted that "FED has repeatedly requested both verbally and via email, for PNI to submit both a winterization plan and a written request to work on weekend, per contract requirements" and, as of February 3, 2023, PNI had done neither (*id.*).

91. The CO determined that, as of the date of termination, the contract was 3.6% complete (R4, tab 141 at 6).

No Progress Payment Requests Submitted Prior to Contract Termination

92. PNI did not submit any progress payment requests prior to contract termination (R4, tab 141 at 6). The CO in his determination and findings noted that "[n]o payments have been disbursed against the contract price," and that "[i]f PNI submits a pay request, the Government will withhold payment for anticipated liquidated damages" (*id.*).

Contractor On-Site Inventory

93. On March 10, 2023, the parties held a site meeting to conduct an inventory for the purpose of contractor demobilization (app. supp R4, tab 32). The COR instructed PNI to leave at the construction site a silt fence and a construction fence, and to not replace asphalt already removed (R4, tab 65 at 153; app. supp R4, tab 32 at 1). PNI was told to submit a schedule to complete demobilization work and submit an itemized list of costs incurred up until March 13, 2023 (app. supp R4, tab 32 at 1).

PNI Price Proposal

94. By letter dated March 13, 2023, PNI submitted both its price proposal for expenses incurred from NTP to contract termination and its demobilization plan (R4,

tab 65 at 153). PNI's price proposal consisted of several spread sheets and requested a total of ₩399,734,856 (*id.* at 154-71), broken down as follows: (1) Construct Rail Spur & Construct Site - ₩82,233,332 (Local Portion, ₩20,100,760; Field Overhead Cost, ₩55,245,888; G&A (2.00 %), ₩1,506,933; Profit (7.00%), ₩5,379,751) and (2) Removals – ₩317,501,524 (Local Portion, ₩77,608,701; Field Overhead Cost, ₩213,303,452; G&A (2.00 %) ₩5,818,243; Profit (7.00%), ₩20,771,128 (*id.* at 154). Additional Field Overhead Cost identified by PNI included employee salary (₩156,625,000), temporary utilities (₩29,086,340), welfare facilities (₩30,338,000), office working expenses (₩19,700,000), communication fare (₩1,400,000), vehicle expenses (₩14,700,000), and safety expenses (₩4,050,000), totaling ₩268,549,340 (*id.* at 155-56).

95. On March 30, 2023, PNI submitted a letter, which PNI's supplemental Rule 4 file index identifies as "Pinewood's Settlement proposal," seeking a "solution" and requesting that the government "consider withdrawing the termination for default and allow Pinewood to finish the Contract at the original Contract price," or consider converting the termination for default "into a termination for convenience and consider paying Pinewood the amount of 399,734,850 won submitted as expenses incurred by Pinewood" (app. supp R4, tab 35 at 1, 5). PNI's March 30, 2023, letter was not identified as a claim, did not request a final decision, and did not include CDA certification (R4, tab 35 at 1-6).

Notice of Appeal – ASBCA No. 63588 (termination for default)

96. On April 20, 2023, PNI filed with the Board a notice of appeal of the default termination, which was docketed as ASBCA No. 63588. With its notice of appeal, PNI submitted a complaint challenging termination of the contract, stating that PNI was entitled to time extensions of 120 days for the government's alleged delay in transferring to PNI the entire project site and 30 days for the government's alleged delay in approving ENG FORM 4025 regarding culvert work (compl. ¶¶ 15, 17, 26-27, dtd. April 17, 2023). PNI also stated that it was entitled to reimbursement of contract costs incurred by PNI prior to termination, in the amount of ₩399,734,850 ($377,108.35 USD) (*id.* ¶ 29). Attached to the complaint was a "CERTIFICATION OF CLAIMS" signed by PNI's president.

PNI May 30, 2023, Certified Claim for Contract Performance Costs

97. On May 30, 2023, PNI submitted its claim seeking issuance of a CO's final decision and requesting that the government (1) withdraw its termination for default, (2) convert the termination into one for the convenience of the government, (3) reimburse PNI its contract performance costs for "work performed by Pinewood from the NTP to Termination," in the amount of ₩399,734,850, and (4) reimburse PNI its "costs related to demobilization of the job site" (R4, tab 65 at 1-2). PNI sought

22

payment of the same costs submitted in its March 13, 2023, letter (R4, tab 65 at 152-171; FOF ¶ 94). PNI's claim also included the requisite CDA certification signed by PNI's president (R4, tab 65 at 187).

Government Motion to Dismiss ASBCA No. 63588

98. On June 6, 2023, the government filed a motion to dismiss ASBCA No. 63588 for lack of jurisdiction, alleging that PNI had not submitted to the CO a request for a final decision on the delay and monetary claims set forth in PNI's complaint (gov't mot. at 4-5). The parties subsequently filed responsive and reply briefs.

PNI Notice of Appeal – Deemed Denial of May 30, 2023, Claim

99. On August 13, 2023, PNI filed with the Board a notice of appeal based upon the CO's deemed denial of PNI's May 30, 2023, claim. That appeal was docketed as ASBCA No. 63686. With its notice of appeal, PNI submitted a second complaint. In addition to once again challenging termination of the contract, PNI stated that it was entitled to (1) time extensions of 120 days for the government's alleged delay in transferring to PNI the entire project site and 30 days for the government's alleged delay in approving ENG FORM 4025 regarding culvert work, and (2) reimbursement of contract costs incurred by PNI prior to termination, in the amount of ₩399,734,850 ($377,108.35 USD) (compl. ¶¶ 17, 27, 38-39, dtd. August 14, 2023).

Government Withdrawal of Motion to Dismiss/Stay of Proceedings

100. On September 20, 2023, the government withdrew its earlier motion to dismiss, based upon PNI's May 30, 2023, certified claim submission and subsequent August 13, 2023, appeal of the government's deemed denial of that claim. The Board accepted the government's withdrawal of its motion to dismiss (Order dtd. September 25, 2023), and on September 26, 2023, the parties requested a stay of proceedings pending issuance of a CO's final decision on PNI's May 30, 2023, certified claim.

Final Decision on May 30, 2023, Claim

101. The CO issued a final decision on March 6, 2024, denying PNI's May 30, 2023, claim (R4, tab 64). Regarding PNI's claim for its pre-termination costs, the CO stated that pursuant to the contract, PNI is "liable for any damage to the Government resulting from the [c]ontractor's failure to complete the work within the specified time, whether or not the contractor's right to proceed with the work is terminated," including "increased costs incurred by the Government in completing the work" (*id.* at 46-47). The CO denied "PNI's request for payment for work it performed given that PNI

23

failed to complete its work within the time allotted for the contract," stating that PNI had completed only 3.6% of the contract work and "the project site was virtually clean, requiring little Government analysis of the condition or inventory of onsite construction materials" (*id.* at 47).  The final decision contained no analysis of the actual or specific costs PNI submitted in its claim.  On March 14, 2024, after issuance of the March 6, 2024, final decision, the Board lifted the stay of proceedings (Order dtd. March 14, 2024).

DECISION

I.  Contentions of the Parties

PNI challenges the government's default termination as arbitrary, capricious and unreasonable, alleging that "[t]he government failed to grant an extension of time for delays resulting from the late transfer of the project site," and failed to timely "approve Eng Form 4025 Culvert, submitted on November 26, 2022, preventing the appellant from further performing under the Contract" (app. br. at 4).  PNI also states that "[t]he government is liable for the progress payment the appellant requested" (*id.*).

The government counters, stating that the record establishes PNI "did not perform in a timely manner," that "seven months into its ten-month construction contract, PNI had only completed 3.6% of the work when it should have been at 60% complete," and that at the time of termination PNI "had only just started demolition work" (gov't br. at 70-71).  Regarding PNI's claimed government-caused delays, the government responds that PNI has failed to meet its burden of establishing that the delay in releasing a portion of the taxi yard or approving PNI's concrete culvert plan prevented PNI from timely performing the contract (*id.* at 95-97).  The government alleges that areas of the project site other than the taxi yard were available for PNI to perform work and that PNI failed to submit and obtain approval for other contractually-required work plans and submittals which PNI needed to obtain before starting work covered by the concrete culvert plan (*id.*).  The government's briefs do not address in any detail whether PNI is entitled to recover its pre-termination costs, other than summarily stating that "PNI is not entitled to have the termination for default set aside nor is appellant entitled to recover on its costs" (*id.* at 123).

II.  Proceedings Pursuant to Board Rule 11

Board Rule 11 gives the parties the option of waiving their right to a hearing and instead submitting their appeal for a decision on the written record; with the Board issuing factual findings on disputed facts.  *Trade West Constr., Inc.*, ASBCA No. 61068, 22-1 BCA ¶ 38,214 at 185,596.  Pursuant to Board Rule 11(d), the weight given to evidence contained in the written record rests "within the discretion of the Board."

III. The Evidentiary Record Establishes the Propriety of the Government's Termination of the Contract for Default

A termination for default is a government claim. *Securiforce Int'l America, LLC v. United States*, 879 F.3d 1354, 1363 (Fed. Cir. 2018). "When a CO terminates a contract for default, and the contractor appeals that termination decision, 'the government . . . bear[s] the burden of proof with respect to the issue of whether termination for default was justified.'" *Dep't of Transp. v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1375 (Fed. Cir. 2023) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)). The government must prove proper justification by a preponderance of the evidence. *CKC Sys., Inc.*, ASBCA No. 61025, 19-1 BCA ¶ 37,385 at 181,750. "[A] default-termination is a drastic sanction [citation omitted] which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct. Cl. 45, 57, 408 F.2d 424, 431 (1969).

In appeals involving failure to make progress - the issue presented here - "the government must establish that 'the CO's decision to terminate . . . was reasonable given the events that occurred before the termination decision was made.'" *Eagle Peak*, 69 F.4th at 1375 (quoting *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357–58 (Fed. Cir. 2004)). Whether the government's termination of the contract was reasonable is an objective inquiry, based not upon the CO's subjective beliefs, but upon a review of the evidentiary record developed during the proceedings here. *Id.* at 1375-76. Our inquiry focuses "on 'tangible, direct evidence reflecting the impairment of timely completion'" to "decide the actual performance that the contract requires and the amount of time remaining for performance." *Id.* at 1376 (quoting *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016-17 (Fed. Cir. 2003)).

There can be little doubt that the government has established by preponderant evidence that PNI was in default of its contract for failure to make progress and that the government was justified in terminating the contract pursuant to the contract's default clause (FOF ¶ 7). The totality of the record reflects that PNI failed to make sufficient progress throughout the period of contract performance. A month into contract performance, the government expressed to PNI concern about the lack of work performed on the project thus far (FOF ¶ 27), with PNI acknowledging it was "late to start this project," as well as its late submissions "due to the late manning for this project" (FOF ¶ 28). PNI displayed a continuing inability to satisfy the contract's requirement that it submit and obtain approval of its temporary power plan and field office submissions (FOF ¶¶ 9-10, 13, 27, 31, 38, 43-45, 76, 82). PNI only once successfully submitted a contractually required construction schedule that was approved by the government (FOF ¶¶ 41-42, 51, 58, 77). The record is replete with examples of PNI's failure to submit acceptable, contractually required schedule

updates or respond properly to concerns expressed by the CO (FOF ¶¶ 5, 11, 19-22, 25, 27, 29, 34, 37, 41-42, 44, 47-48, 51-52, 58, 67, 77, 83-85).

Both the show cause letter and the CO's final decision detail at length the government's many concerns about PNI's lack of progress on the project (FOF ¶¶ 73-77, 85-92), including the fact that, as of issuance of the show cause letter (January 9, 2023), only 141 days out of 300 remained to complete all work on the project (FOF ¶ 73), and as of the date of contract termination (February 17, 2023), the contract was only 3.6% complete (FOF ¶ 91).  Indeed, PNI's response to the show cause letter recognized that it "is responsible for some delay" and that PNI had "met with some difficulty in the subject FED project," noting that "it was not easy to find the key personnel as this project is the small contract amount & short working period" (FOF ¶¶ 81-82).

Based upon our detailed findings of fact and the discussion above, we conclude that the government has met its burden of establishing by preponderant evidence the propriety of its default termination.  *Eagle Peak*, 69 F.4th at 1376 ("If the adjudicatory tribunal finds, based on all the evidence before it, that the standard for termination under the contract's default clause is met, it is to uphold that decision whether or not the CO stated the basis for that finding").

IV.  PNI Has Not Established that its Failure to Perform was Excused

Once the government satisfies its burden and establishes a prima facie case of default, the burden then shifts to the contractor to establish that its failure to perform was excused.  *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996).  The contractor can meet its burden by establishing that "the government materially breached the contract thereby discharging [the contractor's] duty to perform," or that the contactor's failure to perform was well beyond its "control and without its fault or negligence or that of its subcontractors or suppliers."  *Highland Al Hujaz Co., LTD.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,164 (citations omitted).

As the Court of Appeals for the Federal Circuit explained in *Kinetic Builder's Inc. v. Peters*, "[a] contractor seeking to prove the government's liability for a delay has the burden of proving the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in the contractor's performance, and the alleged harm to the contractor for the delay."  226 F.3d 1307, 1316 (Fed. Cir. 2000).  To establish that "causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract." *Id.* at 1317.  Thus, PNI has the burden of establishing by preponderant evidence both the existence of an excusable cause of delay as well as the extent to which completion of the contract work was delayed as a whole.  *GSC Constr., Inc.*, ASBCA Nos. 59402, 59601, 21-1 BCA ¶ 37,751 at 183,243; *Fru-Con Constr. Corp.*, ASBCA Nos. 53544,

53794, 05-1 BCA ¶ 32,936 at 163,158-59 ("[T]he delay must be to work on the critical path because only work on the critical path has an impact upon when the project is completed"). General allegations of delay and its impact are insufficient to establish entitlement.

The contract required PNI submit an initial construction schedule that it updated monthly and that included a narrative report reflecting information regarding the project's critical path (FOF ¶¶ 21-22). Although the concept of critical path was addressed in PNI's September 14, 2022, initial construction schedule (FOF ¶ 34)—which the government conditionally accepted on September 29, 2022 (FOF ¶ 42)—during contract performance PNI failed to submit revised construction schedules meeting the contract requirements, including the need to update the project's critical path (FOF ¶¶ 48, 58, 78). Perhaps not surprisingly, therefore, PNI's briefs neither specifically mention, nor discuss the import of establishing the contract's "critical path" for purposes of analyzing the extent to which alleged government delay impacted PNI's ability to make satisfactory progress towards meeting the CCD.

As the CO noted in the show cause letter, PNI "neither officially submitted any evidence or explanation concerning why your firm has been delayed in progressing with the work due nor have you provided any written notice to the KO/ACO of any potentially compensable delays" (FOF ¶ 77). Other than argument of counsel, PNI offers no record citation supporting a finding that the government's alleged delay in releasing the taxi yard delayed the critical path of the project. *Zafer Constr. Co.*, ASBCA No. 56769, 17-1 BCA ¶ 36,776 at 179,231 ("Counsel's unsupported argument is not proof"); *ECC Int'l LCC*, ASBCA Nos. 61176, 62029, 21-1 BCA ¶ 37,824 at 183,692 (appellant's counsel "simply saying it does not make it so").[10] PNI's failure to present a critical path analysis demonstrating the impact of the government's alleged delay "is fatal to its claim." *Wright Bros., the Building Co., Eagle LLC*, ASBCA No. 62285, 23-1 BCA ¶ 38,255 at 185,776.

Regarding release of the taxi yard, in addition to PNI's failure to include an analysis of the impact of that issue on the project's critical path, there remained other work that PNI could have performed not involving on the taxi yard. As noted by the government, work on the taxi yard "comprised a small percentage of the entire project site" (gov't reply at 8; *see* FOF ¶¶ 23, 85). Regarding the portion of the project site that the government released to PNI in September 2022 (which comprised a much larger percentage of the project site), appellant did not conduct any utility work such as surveying, testing, digging, and trenching that was required on that portion of the site (FOF ¶¶ 40, 85). Indeed, this larger portion of the project site released to PNI

---

[10] The record details the government's continuing efforts to remove taxi cabs parked in AAFES taxi yard, which finally was cleared on December 26, 2022 (FOF ¶¶ 23-24, 44, 46, 51, 59-60, 62).

concerned "construction of an approximately 330 meter long rail spur" and shifting "approximately 180 meters of the existing rail main track" (FOF ¶¶ 3-4; R4, tab 4 at 5-6, tab 32 at 2 (photos depicting project site). The record establishes that (1) PNI's subcontractor Two Track was supposed to perform the actual track work and (2) Two Track was not on the project site for any meaningful amount of time or work prior to contract termination (FOF ¶¶ 2, 26-27, 33, 44, 47, 61, 74).

PNI argues that release of the taxi yard impacted its ability to proceed with culvert work elsewhere within the project site because water/sewer flowed downward from the culvert under the AAFES taxi parking lot through the entire 80-meter culvert. According to PNI, "[t]o carry out the works of demolishing the 69 meters of the existing culvert and rebuilding the culvert, taking out the existing utility lines and installing new utility lines, and other associated works, it was essential first to remove the asphalt and concrete layers covering the AAFES taxi parking lot" (app. br. at 24). PNI argues "[i]t was impossible to demolish the existing culvert in areas other than the AAFES taxi parking lot first since the water/sewer flowing through the existing culvert flowed from the east to the west," and "[a]dditionally, water/sewer first had to be diverted by installing the pipe from the remaining culvert under the AAFES taxi parking lot to the other end of the existing culvert by passing the 69 meter culvert to be demolished and rebuilt (*id.* (citing app. supp R4, tab 1 at 7-8)). However, record evidence suggests that PNI had a different view regarding culvert demolition during contract performance. As reflected in a meeting on December 2, 2022, PNI had "previously mentioned that the existing box culvert can be demoed immediately," but that the COR did "not see that on the schedule" (FOF ¶ 52).

Regarding the status of the government's review of PNI's concrete culvert submittal,[11] the record reflects that PNI still was not otherwise able to begin culvert work. Prior to performing culvert work, the contract required PNI to submit and receive approval of its shoring plan and dewatering work plan (FOF ¶ 15). The government correctly notes that even after December 26, 2022, the date the AAFES lot was cleared, "the record demonstrates that on January 9, 2023[,] the government's construction control representative noted that PNI was still required to submit a concrete mix plan, dewatering, shoring and underground electrical distribution shop drawings" before work could begin on the concrete culvert (gov't reply at 9). The record clearly supports such a finding (FOF ¶¶ 15, 54, 56, 67, 69, 78, 85). For example, as of January 4, 2023, PNI was still working on its shoring plan which was, in turn, "delaying the scheduled start of activity C30005 – Shoring for Culvert" (FOF ¶ 67). Indeed, as noted in the January 9, 2023, QAR, as of that date, PNI had "effectively completed progress on all activities which have approved submittals," and

_____

[11] The record establishes that the government did not review PNI's culvert submittal within the 30 days specified in the contract (FOF ¶¶ 18, 50, 55, 78-79).

that "[t]he majority of submittals to date have either been returned for corrections or rejected completely" (FOF ¶ 78).

In addition, at the time of contract termination, PNI still had several other outstanding submittals requiring submission and approval. For example, PNI had not successfully submitted any documents required for approval of the electrical and communications systems line item of work (CLIN 004), which included a shop drawing and several product data submittals (FOF ¶¶ 4, 16, 78). From early December 2022, into January 2023, PNI still was in the process of conducting preliminary removal and demolition work (FOF ¶¶ 57, 63, 68, 72).[12] Indeed, on January 6, 2023, PNI informed the government "we can't execute additional activity" as the "dewatering plan, shoring plan, elec and comm shop drawing are not submitted and these feature of work's [sic] concerned submittals are also not approved" (FOF ¶ 70). That same day, PNI asked instead whether it could conduct preparatory inspection for earthwork and was informed by the QAR that the request was denied "based on PNI[']s admitted lack of preparation, the potential for confusion of performing an abbreviated PI for limited activity, and a general lack of timely coordination by PNI staff" as well as the concern that "it is imprudent to conduct a PI for Earthwork until PNI has all associated plans and submittals approved for this feature of work" (FOF ¶¶ 71-72).

PNI argues that "[w]hile Pinewood was performing under the Contract, the government never once instructed Pinewood to work on other matters since Pinewood had 'access to the greater majority of the project site from the beginning around August 22, 2022'" (app. br. at 11). Given the nature of this fixed-price construction contract, it was not the government's role to instruct PNI or decide how best to perform the contract. As the government succinctly stated in its reply brief, as contractor, PNI "is responsible for determining how it will perform the job" (gov't reply at 2 (citing *Canfield Mach. & Tool Co.*, ASBCA No. 10390, 65-2 BCA ¶ 5018 at 23,667)).

V. PNI is Entitled to Reimbursement for Work Performed Prior to Termination

"[A] construction contractor who has been terminated for default is entitled to payment for work that was properly performed in accordance with the contract prior to the default termination." *Sungjee Constr. Co.*, ASBCA No. 62002, 23-1 BCA ¶ 38,400 at 186,597 (citing *J.G. Enters., Inc.*, ASBCA No. 27150, 83-2 BCA ¶ 16,808 at 83,543). PNI must "prove that it performed work for which it was entitled to be

---

[12] PNI submitted its contractually-required demolition plan (FOF ¶ 14) on September 5, 2022, which initially was disapproved; PNI's resubmitted plan was approved on September 23, 2022—almost two months after contract award (FOF ¶¶ 35-36, 39).

29

paid." *Id.* (citing *Truckla Servs., Inc.*, ASBCA No. 57564, 17-1 BCA ¶ 36,638 at 178,447-48). "Where a contractor fails to provide accounting or other evidence to substantiate its allegations of a quantum recovery, it has not met its burden of proof and is therefore not entitled to payment." *GSC Constr., Inc.*, ASBCA Nos. 59046, 59957, 16-1 BCA ¶ 36,437 at 177,603 (citing *Env't Safety Consultants, Inc.*, ASBCA No. 53485, 03-2 BCA ¶ 32,298 at 159,808). In *GSC*, the contractor's evidence submitted in support of its quantum position was a "three-page claim to the CO" in the form of a narrative that neither included nor was "accompanied by any accounting or other evidence sufficient" for a reasonable trier of fact to find that the contractor (assuming entitlement) was owed the amount sought. *Id.*

Like the contractor in *GSC*, PNI essentially relies upon the claim it submitted to the CO as support for its quantum calculations. Unlike the contractor in *GSC*, however, PNI's claim includes several spread sheets setting forth in detail the type of costs incurred and the way those costs were calculated. PNI does not seek specific delay damages and, as such, does not tie any costs incurred to a specific alleged government caused delay, nor does it offer a critical path analysis to establish which delay or disruption caused a day-for-day delay of the project itself. Rather, PNI seeks payment for work performed prior to the default termination. Although PNI never submitted a proper progress payment request prior to termination (FOF ¶ 92), the government did instruct PNI to submit an itemized list of costs incurred on the contract (FOF ¶ 93).[13]

The record establishes that PNI performed contract work (mainly demolition) prior to termination, and after termination PNI was instructed to leave on site certain work items already performed (FOF ¶¶ 53-54, 56-57, 61-66, 68, 93).[14] At the time the parties elected to proceed with a decision on the record pursuant to Rule 11, the parties did not elect that the decision include a determination of quantum as well as entitlement. Indeed, neither party's briefs provide any meaningful discussion of the pre-termination costs PNI seeks, or PNI's entitlement to specific claimed costs, with the government summarily stating only that PNI is not entitled to recover its pre-termination costs (gov't br. at 123). Although the CO's memorandum in support of the decision to terminate the contract for default states "[i]f PNI submits a pay request, the Government will withhold payment for anticipated liquidated damages," (FOF ¶ 8, 92), the government has offered no record evidence that it actually assessed liquidated

---

[13] Had PNI submitted a progress payment request to the government, the contract granted the government the right to "retain a maximum of 10% of the amount of the payment until satisfactory progress is achieved" (FOF ¶ 6).

[14] The default clause grants the government the right to "take possession of and use any materials . . . on the work site necessary for completing the work" (FOF ¶ 7).

damages.[15] To determine the actual amount owed will require the parties to review the costs set forth in PNI's claim, considered in conjunction with work performed prior to termination. Accordingly, PNI is entitled to yet undetermined reimbursement for its pre-termination incurred costs. Determination of the specific amount is returned to the parties to decide quantum.

CONCLUSION

For the reasons stated above, appellant's appeal challenging the default termination of the contract is denied (ASBCA No. 63588). Appellant's challenge to the government's denial of its pre-termination costs (ASBCA No. 63686) is sustained to the extent we hereby return the appeal to the parties to negotiate and resolve quantum.

Dated: April 21, 2025

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[15] We note that PNI alleges that the government entered "a replacement contract," asserting, without citation to the record, that the resolicited "replacement contract was not satisfactorily completed," and that "the new contract was terminated because of the problems with the project" (app. br. at 35). The government does not address these allegations in its reply brief.

31

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63588, 63686, Appeals of Pinewood Inc. fka PNI Incorporation, rendered in conformance with the Board's Charter.

Dated: April 21, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals